IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TRAVIS CASEY | § | |
|  Plaintiff | § | |
| | § | |
| v. | § | |
| | § | A-09-CA-337 SS |
| OFFICER DAVID RODRIGUEZ and | § | |
| THE CITY OF AUSTIN | § | |
|  Defendants | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE SAM SPARKS:

 COME NOW, Officer David Rodriguez and the City of Austin, and file Defendants' Motion for Summary Judgment in response to *pro se* Plaintiff's First Amended Complaint, pursuant to Rule 56, Federal Rules of Civil Procedure, and respectfully show as follows:

## I.
## Introduction

 Officer David Rodriguez and his partner had the description of a suspect that exposed himself to a police officer, assaulted a police officer, evaded arrest, and the fleeing suspect was refusing verbal commands to stop when Officer Rodriguez fired to keep the suspect from running over him, fearing that the suspect already ran over his partner, and believing that the suspect posed an imminent threat of bodily harm with a deadly weapon, a 2-ton vehicle. The dash cam video establishes that the suspect then led a patrol car on a 1½ mile chase over 80 m.p.h. nearly causing two collisions, and the chase ended when the suspect hit a dead end. Plaintiff did not protest his arrest, or even ask why he was being arrested, much less report that two hippies just shot him and they should be the ones arrested. Rather than showing anger or even surprise at being shot and arrested, Plaintiff apologized profusely, admitted to APD "I'm sorry, I screwed up," and admitted to EMS that he was pursued by APD and shot.

Plaintiff sues Officer David Rodriguez and the City of Austin for assault and excessive force under the Fourth and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. §1983 based on one of seven shots fired striking his forearm. There was no constitutional violation, Officer Rodriguez is entitled to qualified immunity, and the City is not liable under *respondeat superior*. The Court should decline to exercise pendent jurisdiction over Plaintiff's state law assault claim, or dismiss because governmental immunity is not waived for intentional torts.[1]

## II.
## Factual Presentation

Plaintiff drove his tan Mercury Sable in the dark to Walnut Creek Park in northeast Austin at approximately 5:30 a.m. on April 30, 2007, his puppy in the front seat. Exhibit 1.[2]

### A.   Undisputed Facts

The City had been receiving citizen complaints about children finding used condoms in the woods, and observing sexual encounters between men in cars and restrooms in the park. Exhibits 2-3. The City continuously monitors public parks, and conducts sting operations, and signage at the park entrance warns visitors of the presence of undercover officers. Exhibits 2-3.

### 1.   The Shooting in the Park

Public Safety and Emergency Management ("PSEM") planned a public lewdness sting in response to increasing citizen complaints. Exhibits 2-3. Sergeant David Becker had experience in previous stings and led the operation. Sgt. Becker briefed members of the operation on the specific plan at 5:00 a.m. at headquarters, and assignments were made to team members. Exhibits 3-5.

---

[1] "As such conduct was intentional, Plaintiff's claim for assault could not have been brought under the Tort Claims Act." *Plaintiff's Original Complaint*, ¶36.
[2] Travis Casey deposition, p.46, 89.

2

| | |
|---|---|
| Close Cover Unit (plain clothes) | Sgts. Becker, Chalfoun |
| Bait Unit (plain clothes) | Ofcrs. Rodriguez, Corpus |
| Take Down Bike Unit (plain clothes) | Ofcrs. Gannon, Labadens, Aguilar |
| Transport Unit (uniforms/patrol cars) | Ofcrs. Cruz, Dale, Wooldridge |

The Close Cover, Bait, and Take Down Units wore badges and ID hidden from view and took positions in the park. Exhibits 3-5. Take Down Officers arrived in a bike truck. Bait Officers arrived with Sgts. Becker and Chalfoun in an SUV, and parked in a parking lot with a view of the restrooms next to the baseball field. Exhibits 3-5. From this vantage point, the Sergeants could coordinate all units, and maintain surveillance on the Bait Officers who would take positions at the restrooms. Exhibits 3-5. Transport Officers took positions at the park perimeter in marked patrol cars. Exhibit 3.

Officer David Rodriguez (Hispanic male, age 38, 5'6", 140 pounds, clean shaven) partnered with Officer Frank Corpus (Hispanic male, age 29, 5'9", 210 pounds, clean shaven) who had participated in undercover park operations, and had experience in public lewdness stings. Exhibits 4-5 Ofcrs. Rodriguez and Corpus were plain clothes Bait Officers, walkie-talkie, cell phone, badges, and weapons hidden from view. Exhibits 4-5. They walked from the parked SUV (Point A), took positions at the restrooms (Point B), and encountered two males without incident. Exhibits 4-6.

Sgts. Becker and Chalfoun observed a male subject park his vehicle (Point C) and take a trail towards the woods (Point D), but were unable to get Ofcrs. Rodriguez and Corpus on the air to advise. Exhibits 3-6. Sgt. Becker (Anglo male, age 48, 6'1", 200 pounds, mustache) followed to ensure the subject did not come upon any sting officers without warning. Exhibit 3. He walked down the same trail knowing men had sex in the wooded area where numerous used condoms are found (Point E). Exhibit 3. Minutes later, Sgt. Becker reported to Sgt. Chalfoun via cell phone that the subject exposed himself and assaulted him to evade arrest, and all units were avised via the Parks radio channel with a

3

description of the suspect named "Travis." Exhibit 9. Officers searched for almost an hour, but did not catch the suspect. Exhibits 3-7.

The morning rain became a heavy downpour and officers were soaked, so at approximately 8 a.m., Sgt. Becker suspended the operation and the team members convened nearby for breakfast and briefing on the indecent exposure and assault. Sgt. Becker radioed the description over the Parks channel of a tan Mercury Sable, and a very tall white male, mid 30's, over 200 pounds, red t-shirt, yellow shorts, white sneakers, identified as "Travis." Exhibits 3-7.

When the rain lifted, the operation resumed at the park at approximately 9 a.m. Exhibits 3-7. Sgt. Becker again parked the SUV to maintain surveillance (Point A), and Ofcrs. Rodriguez and Corpus again walked in the direction of the restrooms (Point B). Exhibits 3-5. As they did so, they observed a male walking toward a parked tan Mercury Sable fitting the description of the suspect who Sgt. Becker had reported had exposed himself and assaulted him (Point C). Exhibits 4-5. The suspect spotted them and rushed to his car, so the officers pulled out their badges and ran to reach the suspect before he could get into his car. Exhibits 4-5. Believing this to be the suspect that just committed misdemeanor indecent exposure, public lewdness, and felony assault on a police officer while evading arrest, the officers feared that once in his vehicle he would have access to a weapon. Exhibits 4-5. The suspect jumped into his car, locked the doors, and heard officers yell verbal commands pounding on the vehicle. Exhibits 1, 4-7.[3]

Ofcr. Corpus was only carrying pepper spray, so Ofcr. Rodriguez drew his weapon and pointed it at the vehicle fearing the suspect had a weapon because he refused to show his hands. Exhibits 4-7. The suspect put his car in reverse almost running over Ofcr. Corpus who dove out of the way to avoid being hit and killed (Point F). Exhibit 5. Ofcr. Rodriguez no longer had a visual on Ofcr. Corpus, and

feared he was dead. Exhibit 4. The suspect put his car in gear heading toward Ofcr. Rodriguez with a blank stare and look in his eyes that caused Ofcr. Rodriguez to believe he was going to kill him. Ofcr. Rodriguez opened fire trying to stop the suspect from running over him, afraid he already ran over Ofcr. Corpus (Point H). Exhibit 4.

Fearing for his life, Ofcr. Rodriguez fired seven (7) shots while simultaneously moving to the right to get out of the path of a speeding 2-ton deadly weapon that was within ten feet. Exhibits 4-8. He believed he had to fire because the car could quickly swerve and hit him if he just moved to the side without firing. Exhibit 4. The forensic evidence shows that six bullets went into the hood of the vehicle with directionality from the front to the right side. Exhibit 8. The last bullet shattered the driver's side window and struck the subject's right forearm. Exhibit 8. Although he had fifteen (15) rounds, Ofcr. Rodriguez ceased firing once the vehicle was no longer bearing down on him and the threat had passed. Exhibits 4-8.

2. The Police Car Chase Out of the Park

The Sergeants radioed "Shots Fired" and the chase was broadcast over PSEM and APD radio channels. Exhibits 9-10. The Sergeants saw the window was shot out, but could not see the driver upright, so they followed to maintain visual in case he was armed, mortally wounded or dead and a danger to himself or the public. Exhibits 3, 7. Transport Officers initiated pursuit in marked patrol cars. Exhibits 3-5, 7-11. The suspect escaped via the north park exit (Point I). Exhibit 6. Ofcr. Anastacio Cruz's dash cam video shows that he activated lights and siren and pursued the suspect who ran the stop sign onto Parmer Lane (Point J). Exhibits 6-11. Even at 80 m.p.h. Ofcr. Cruz could not catch up. Exhibits 6-11. At such a high rate of speed, the subject lost control of his car and spun 360° at the next intersection on a right turn nearly colliding with a sedan (Point K). Exhibits 6-11. He took

---

[3] Travis Casey deposition, p.86, 102-103.

the next left, hesitated at I-35 until traffic was oncoming, then sped into traffic on the southbound frontage road nearly colliding with a white SUV (Point L). Exhibits 6-11. The suspect hit a dead end at construction barricades, and was forced to stop after a mile and a half patrol car chase, was arrested at 9:08 a.m. and repeatedly apologized to officers. (Point M). Exhibits 6-7, 12.[4] At 9:19 a.m.. the suspect told EMS that he was pursued by APD and shot. Exhibit 13. At the hospital, he was treated for a gunshot wound to his right forearm, and for numerous bloody scratches to his arms and legs, and at 10:29 a.m. he told APD the scratches were from his pet ferret, or while he was looking for fossils and deer antlers in the park. Exhibit 7, 12.[5]

At 9:06 a.m., the Take Down Unit responded to "Shots Fired" and Ofcr. Rodriguez reported to Ofcr. Rene Labadens that "the suspect just tried to run him over." Exhibit 7.[6] Sgt. Charles Bethel responded at 9:19 a.m. and a visibly upset Ofcr. Rodriguez reported, "I had my badge out and was yelling police stop. I thought that he was going to kill Corpus or me." Exhibits 4, 7.[7] Ofcr. Rodriguez was repeating over and over to himself, "Oh my God, he tried to kill me." Exhibit 4.

B.  **Disputed Facts**

When Sgt. Becker had followed the subject into the woods, there was a brief verbal exchange and he asked the subject his name and he responded with "Travis." Exhibits 3, 7. The subject exposed his genitals while performing a sexual act and grabbed Sgt. Becker's genitals. Sgt. Becker identified himself as "Police," and told the subject he was under arrest. The subject responded, "Hell no, I'm not going to jail," shoved Sgt. Becker down onto a fallen tree, and ran through the woods. Sgt. Becker sustained minor injuries and made chase, but lost visual in the darkness of the woods.

---

[4] APD General Offense Hardcopy, pp.12-13.
[5] APD General Offense Hardcopy, p.33-35.
[6] APD General Offense Hardcopy, p.6-7.
[7] APD General Offense Hardcopy, p.14.

Based on the dash cam video, photographs, radio communications and forensics, the following facts are not *genuinely* in dispute.

1. The Shooting in the Park

Plaintiff alleges he was in the park "to take a walk," in the dark during a downpour. Exhibit 12. He denies he knew officers approached, and was just afraid he would be "mugged" by Ofcr. Rodriguez because he looked like a "hippie" with a "scraggly mustache." Exhibit 1.[8] He denies ever seeing Sgt. Becker, the only officer with a mustache. Exhibits 1, 3.[9] He admits they were yelling "Stop," but did not see badges. Exhibit 1.[10] He alleges the car was stopped when shots were fired with his hands in the air saying "Please, don't shoot me," then he slowly drove away until he reached the park exit, but the steering was ruined and the car didn't want to move. Exhibit 1.[11]

2. The Police Car Chase Out of the Park

Plaintiff alleges that he was going for help and did not know a patrol car was chasing him lights and siren, and that he pulled over as soon as he saw them. Exhibit 1.[12] The dash cam video establishes Plaintiff was aware they were police officers when arrested, but an hour later at the hospital, he did not know they were police officers yelling "Stop. Stop. Stop" at him in the park, and did not remember hearing "Police," because "it's kind of like a blur," "they were yelling at me and stuff, but I don't remember what they were saying. I couldn't really understand it or hear what," "they were just yelling, 'Stop, stop,' but that's all I remember understanding, is hearing, "Stop." Exhibit 12.[13]

---

[8] Travis Casey deposition, p.40-41, 96, 101.
[9] Travis Casey deposition, p.95.
[10] Travis Casey deposition, p.91, 102-103.
[11] Travis Casey deposition, p.41-42, 87, 114.
[12] Travis Casey deposition, p.111.
[13] Travis Casey hospital statement, p.9, 15-16.

7

## IV.
## Argument and Authorities

Summary judgment is warranted because (i) there was no constitutional violation, (ii) Ofcr. Rodriguez is entitled to qualified immunity, and (iii) the City is not subject to *respondeat superior* liability under §1983.

Plaintiff gives a different version of the facts on arrest, an hour later at the hospital, and three years later in deposition, but the objective evidence is irrefutable. The dash cam video establishes that Plaintiff knew they were officers: (1) "I didn't think he would shoot me," (2) "I wasn't going to run over an officer," and (3) "Thank you for helping me. I'm sorry. I'm sorry I screwed up . . . really bad. I'm sorry." Exhibits 11-12. The forensic evidence establishes that (1) the car was accelerating toward Ofcr. Rodriguez while he fired based on the bullet trajectories in the hood, (2) Plaintiff could not have his hands in the air based on the bullet defects not striking above the hood, and (3) Plaintiff could not have his hands in the air based on the bullet passing through his forearm and landing in the steering wheel air bag. Exhibits 8, 12. The photographic evidence establishes that (1) he must have encountered Sgt. Becker because he was the only officer with a mustache, and (2) the bleeding cuts and scratches on his arms and legs were caused by the briar vines running in the woods evading Sgt. Becker. Exhibits 3, 14. Three years later he now alleges they were blast injuries from flying glass when the window shattered, and one scratch was from his pet ferret. Exhibit 1.[14]

**A.      There Was No Constitutional Violation.**

Ofcr. Rodriguez and his partner had probable cause to arrest based on Sgt. Becker's report, and the force used was reasonable under the totality of circumstances and did not rise to a constitutional violation. "In addressing an excessive force claim brought under §1983, analysis begins by identifying

---

[14] Travis Casey deposition, p.73-74.

the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Seizure claims are analyzed under the Fourth Amendment reasonableness standard. *Id.,* at 395. The determination of reasonableness under the 4th Amendment is "not capable of precise definition or mechanical application . . . [but] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.,* at 397.

To establish the elements of a §1983 excessive force claim, Plaintiff must show (a) he sustained an injury, (b) the injury resulted directly and only from the use of force excessive to the need, and (c) the use of that force was objectively unreasonable. *Bush v. Strain,* 513 F.3d 492, 501 (5th Cir. 2008). In deciding objective reasonableness, the court must consider whether the totality of circumstances justified the particular use of force, "such that the need for force determines how much force is constitutionally permissible." *Id.* Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, at 396. "[P]olice officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Id.*

    1.    <u>Officer Rodriguez used constitutionally permissible force.</u>

Officer Rodriguez is sued in his individual capacity. The forensic evidence establishes Plaintiff was accelerating, but even if he was at a complete stop as he now alleges, Ofcr. Rodriguez acted based

on the totality of circumstances as any reasonable officer would. Even if Plaintiff thought he was being mugged, "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his act." *Young v. City of Killeen, Tex.,* 775 F.2d 1349, 1353 (5th Cir. 1985). Ofcr. Rodriguez drew his gun when Plaintiff refused to show his hands and exit the vehicle fearing he may have a weapon. Exhibit 4. He opened fire only after Plaintiff reversed, he lost visual on his partner, and Plaintiff put the car in drive and was staring him down. Exhibits 1, 4. "The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Ramirez v. Knoulton,* 542 F.3d 124, 130 (5th Cir. 2008), citing *Elliott v. Leavitt,* 99 F.3d 640, 643 (4th Cir. 1996). They don't have to wait to be run over either. Officers are trained that a moving vehicle is a deadly weapon, he had seconds to act, and his use of force was not excessive to the need because he ceased firing once the threat had passed. Exhibits 2-5, 7-8, 14.

At 9:07 a.m. Ofcr. Rodriguez made a *res gestae* statement when he cried out to Ofcr. Corpus, "Frankie, I thought he was going to kill us!" spontaneously with no time to fabricate a story. Exhibits 4-5. He made the same report to Ofcrs. Labadens and Bethel when they arrived at 9:06 and 9:19 am. Exhibit 7.[15] He would have no need to fabricate because he followed training and policies, as any reasonable officer would to protect his life. Officers are trained that they may respond to deadly force with deadly force. Exhibits 2-5, 14-15.

   a. *Officer Rodriguez has no excessive force complaints.*

Ofcr. Rodriguez has no excessive force complaints during his six (6) years with the City, and has almost 1,500 hours of police officer training, including training on use of force, far exceeding the 618 hours required by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE"). Exhibit 4.

                b.      *Officer Rodriguez is entitled to qualified immunity.*

Alternatively, it is "sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity. Once the [movant] asserts this affirmative defense, the burden *shifts* to the plaintiff to rebut it." *Hathaway v. Bazany,* 507 F.3d 312, 319 (5th Cir. 2007), quoting *Cousin,* 325 F.3d at 632. Even though the officer in *Hathaway* did not know at what point he drew his weapon and fired at the vehicle, he was entitled to qualified immunity. *Hathaway,* at 316. The Fifth Circuit has found that officers facing a grave threat to personal safety from a motor vehicle with only seconds to make a decision act reasonably and are entitled to qualified immunity. *Hathaway,* at 322. When "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

In finding the shooting justified in a motor vehicle case, the Fifth Circuit has focused on a number of factors, including the previous hazardous activity of the car. *Hathaway,* at 321. Central to its analysis was the limited time the officers had to respond and the closeness of the officers to the projected path of the vehicle. *Id.* "Given the extremely brief period of time an officer has to react to a perceived threat like this one, it is reasonable to do so with deadly force." *Hathaway,* at 322, citing *Graham,* 490 U.S. at 396-97, 109 S.Ct. 1865. Ofcr. Rodriguez acted with the good faith belief that his partner had been run over when he lost visual after Plaintiff reversed, and he acted as any reasonable officer would with only seconds to act when Plaintiff accelerated within ten (10) feet. <u>Exhibits 4, 8, 14.</u>

---

[15] APD General Offense Hardcopy, p.6-7, 14..

Further, "an officer may be shielded from liability even if he is mistaken." *Evett v. DETNTFF,* 330 F.3d 681, 688 (5th Cir. 2003). Even if Defendants erred in taking action, they are entitled to qualified immunity if their actions were reasonable, albeit mistaken. *Anderson v. Creighton,* 107 S.Ct. 3034, 3039-40 (1987).

2.  <u>The City of Austin</u>

There is no municipal liability without a constitutional violation under §1983. *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Further, there is no *respondeat superior* liability under §1983. *Monell v. Dept. of Social Services,* 436 U.S. 658, 694 n.58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

   a.   *Plaintiff has no evidence of a policy or custom of using excessive force.*

Pursuant to training and policy, "deadly force may <u>only</u> be used when the officer has a reasonable belief that another person poses a threat of death or serious physical harm either to the officer or another." <u>Exhibits 2-5, 14-15.</u> Ofcr. Rodriguez used deadly force believing his partner had been run over and he was next. <u>Exhibits 4, 7.</u>

   b.   *Plaintiff cannot show failure to train as a matter of law.*

To establish municipal liability, Plaintiff must show "(1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the training policy, and (3) the inadequate training policy directly caused the plaintiff's injury." *Conner v. Travis County,* 209 F.3d 794, 796 (5th Cir. 2000) (quoting *Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir. 1996).) For an official to act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837

(1994)). Further, failure to train must prove failure to control a "known propensity for the improper use of force." *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005). To prove deliberate indifference, a plaintiff must demonstrate at least a pattern of similar violations *of excessive force* arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation. *Id.,* at 292.

Ofcr. Rodriguez consistently has good evaluations, and has never had a complaint of excessive force to suggest a need for further training. Exhibit 4. Therefore, Plaintiff cannot show "deliberate indifference," by the municipality to claim the foreseeable probability of another excessive force incident. The Fifth Circuit has found it nearly impossible to establish deliberate indifference, sufficient to state a claim on the basis of a single incident. *Gabriel v. City of Plano,* 202 F.3d 741, 745 (5th Cir. 2000).

Further, failure to train claims fail when the governmental entity complies with state-mandated minimum training requirements. *Gonzales v. Westbrok,* 118 F.Supp.2d 728, 737-78 (W.D. Tex. 2000); citing *Conner v. Travis County,* 209 F.3d 794, 798 (5th Cir. 2000). Ofcr. Rodriguez' training exceeds state requirements for certification with 1,500 hours, exceeding the 618 hours required for TCLEOSE certification in Texas. Exhibits 2, 4, 14. Candidates must pass the TCLEOSE exam to be certified as a peace officer by the state. After commission, TCLEOSE requires that officers undergo a minimum of 40-hours every two years of in-service training, which Ofcr. Rodriguez exceeds. Exhibits 2, 4.

## V.
## Summary Judgment

Summary judgment is proper against a party who bears the ultimate burden of proof and fails to establish the existence of an element essential to its case by raising an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party satisfies

its burden by "pointing out to the district court . . . that there is an absence of evidence to support the non-moving party's case." *Id.,* at 326. The plaintiff may not rest on allegations in pleadings, but must produce competent, tangible evidence to survive summary judgment. *Id.,* at 325. Further, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996).

## VI.
## Prayer

WHEREFORE, Defendants pray that their motion be granted, and seek attorney's fees and costs, and any additional relief to which they are entitled under law or in equity.

RESPECTFULLY SUBMITTED,

KAREN M. KENNARD, ACTING CITY ATTORNEY
ANNE L. MORGAN, CHIEF, LITIGATION DIVISION

*/s/ Chris Edwards*
CHRIS EDWARDS
Assistant City Attorney
State Bar No. 00789276
City of Austin-Law Department
P. O. Box 1546
Austin, Texas 78767-1546
(512) 974-2419

ATTORNEYS FOR DEFENDANTS

### Certificate of Service

I hereby certify that on January 14th, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and sent notification of such filing to the following:

**Via E-Mail, U.S. Regular & Certified Mail to:**
Travis Casey
1313 Byers Lane
Austin, Texas 78753

*/s/ Chris Edwards*
CHRIS EDWARDS

# APPENDIX

| | |
|---|---|
| Exhibit 1 | Travis Casey – deposition |
| Exhibit 2 | Chief of Public Safety Bruce Mills – Affidavit |
| Exhibit 3 | Sergeant David Becker – Affidavit & incident photos |
| Exhibit 4 | Officer David Rodriguez – Affidavit, IAD, training record & incident photos |
| Exhibit 5 | Officer Frank Corpus – Affidavit, training record & incident photos |
| Exhibit 6 | Walnut Creek Park – photos, diagram, aerial map |
| Exhibit 7 | APD General Offense Hard Copy |
| Exhibit 8 | APD Forensics & photographs |
| Exhibit 9 | DVD & transcript – Parks radio audio & Incident Detail Report |
| Exhibit 10 | DVD & transcript – APD radio audio & Incident Detail Report |
| Exhibit 11 | DVD & transcript – dash cam video/audio & enhanced audio |
| Exhibit 12 | DVDs & transcripts – Travis Casey arrest, hospital statement & photos |
| Exhibit 13 | EMS transport records |
| Exhibit 14 | Albert Rodriguez – expert Affidavit & crime scene photos |
| Exhibit 15 | APD, PSEM & Park Police General Orders – B101 Use of Force |
| Exhibit 16 | Affidavit – Chris Edwards |

*If you need assistance playing any DVD, please contact Gayla Kieke, Legal Assistant @ 974-2418.*