# EXHIBIT 1

Travis Casey                                                August 2, 2010

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                 AUSTIN DIVISION
 3
     TRAVIS CASEY,
 4
          Plaintiff,
 5
     v.              CASE NUMBER
 6                   A-09-CA-337 SS
     OFFICER DAVID RODRIGUEZ
 7   and THE CITY OF AUSTIN,
 8        Defendants.
 9
10   * * * * * * * * * * * * * * *
11
          THE ORAL AND VIDEOTAPED DEPOSITION
12
               OF TRAVIS CASEY
13
                August 2, 2010
14
15   * * * * * * * * * * * * * * *
16
17        ORAL DEPOSITION OF TRAVIS CASEY, produced as
18   a witness at the instance of the Defendant and duly
19   sworn, was taken in the above styled and numbered
20   cause on the 2nd day of August, 2010, from 12:20 p.m.
21   to 3:30 p.m., before Sandra S. Givens, CSR, in and for
22   the State of Texas, reported by machine shorthand
23   method, at the City of Austin law offices 301 W. 2nd
24   Street, 4th floor, Austin, Texas 78701, pursuant to
25   the Federal Rules of Civil Procedure.
```

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      Randall Huntsinger
        Tim Flocas
 5      Huntsinger Law Office, PLLC
        P.O. Box 2327
 6      Austin, Texas 78768
        512.708.9814
 7      512.707.9900
 8
     FOR THE DEFENDANT:
 9
        Chris Edwards
10      Assistant City Attorney
        Will King
11      Law Clerk
        302 W. 2nd Street, 4th floor
12      Austin, Texas 78701
        512.974.2419
13
14   ALSO PRESENT:
15      Officer Frank Corpus
16
     VIDEOGRAPHER:
17
        James Taylor
18      Deposition Video Services
        512.835.9330
19
20
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2
 3   Appearances - - - - - - - - - - - - - - - - - - - 2
 4   Exhibits - - - - - - - - - - - - - - - - - - 3
 5   TRAVIS CASEY
 6      Examination by Ms. Edwards - - - - - - - - - - - 4
 7   Changes and Signature - - - - - - - - - - - - - - 118
 8   Reporter's Certification - - - - - - - - - - - 120
 9
10
              E X H I B I T S
11
12   NO.  DESCRIPTION                     PAGE
13   1    Plaintiff's Original Complaint     36
14   2    Plaintiff's First Amended Complaint   44
        and Request for Trial by Jury
15
16
17            CERTIFIED QUESTION
18
     Beginning of Certified Question   Page 79, line  4
19   End of Certified Question         Page 80, line 12
20
21
22
23
24
25
```

**Page 4**

```
 1        VIDEOGRAPHER:  Good afternoon.
 2   This marks the beginning of videotape number 1 in the
 3   deposition of Travis Casey on August 2nd, 2010 in the
 4   matter of Travis Casey v. Officer David Rodriguez and
 5   The City of Austin, Case No. A-09-CA-337-SS in the
 6   U.S. District Court.  Going on the record, the time is
 7   12:20.
 8        TRAVIS CASEY,
 9   having been first duly sworn, testified as follows:
10             EXAMINATION
11   BY MS. EDWARDS:
12      Q   Mr. Casey, I am Chris Edwards.  I'm an
13   Assistant City Attorney for the City of Austin, and
14   I'm defending the City of Austin and Officer David
15   Rodriguez whom you have sued.  I'm sure that your
16   attorneys have given you some idea of what to do in a
17   deposition.  I'm going to go over a few of the ground
18   rules.
19        If I make an objection, you still need
20   to answer the question even though you're -- I'm
21   sorry.  If I ask a question and your attorneys make an
22   objection, you still need to answer the question.
23   Only if your attorneys make an objection and instruct
24   you not to answer the question, may you not answer.
25   Otherwise, you need to answer the question even though
```

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

Travis Casey                                                                                     August 2, 2010

Page 5

1  they make an objection.  Is that clear?
2      A   Yes, ma'am.
3      Q   Okay.  If at any time you need a break, just
4  say so.  And if you could please answer all of my
5  questions with a verbal answer.  Don't nod and shake
6  your head, the court reporter cannot take that down.
7  So you need to speak verbally.
8      A   Okay.
9      Q   And you might speak a little louder as well.
10  Also, are you on any medication today, sir?
11     A   No, I'm not.
12     Q   None at all?
13     A   None.
14     Q   Okay.  So if you need break, let me know.
15  Otherwise, I don't think we're going to be too long
16  today.  If you don't understand my questions, let me
17  know.  I can restate it or ask it another way so that
18  it is clear to you.  Otherwise, I'm going to assume
19  that you have answered everything honestly.  Have you
20  ever done a deposition before?
21     A   Yes.
22     Q   You have?  When was that?
23     A   I believe it was in 2004.
24     Q   What was that for?
25     A   I was employed at Family Dollar and, as an

Page 6

1  assistant manager, and an employee had came to me and
2  described how a supervisor above me had broken policy
3  by, well, sexually harassing.  And I was in a position
4  to report that to the chain of management above him,
5  and when I'd arranged the meeting that supervisor had
6  came in and terminated my employment for trying to do
7  that and...
8      Q   So an employee came to you and made a report
9  of sexual harassment?
10     A   Yes.
11     Q   And what was that employee's name?
12     A   I don't recall the employee's name.
13     Q   Was it a male or a female?
14     A   It was a male.
15     Q   Okay.  And you were the assistant manager?
16     A   Yes, I was.
17     Q   And who was he reporting had sexually
18  harassed him?
19     A   That supervisor's name was, I believe it
20  was, it was Will Hanson, I believe.
21     Q   Will Hanson was the alleged sexual harasser?
22     A   Yes.  That's correct.
23     Q   Was he the store manager?
24     A   He was the supervisor over the Austin
25  district above the manager, so to speak.

Page 7

1      Q   Okay.  And after you reported the sexual
2  harassment allegation when were you terminated?
3      A   At the time of the arranged meeting with
4  that supervisor, the supervisor out of Georgetown.
5      Q   I'm sorry?
6      A   Their headquarters is located in Georgetown.
7  I had to arrange a meeting with the supervisor to
8  communicate the employee's concerns.
9      Q   Um-hm.
10     A   When that supervisor came to the meeting he
11  just terminated me.  I felt that was a wrongful
12  termination.
13     Q   Did you file a lawsuit?
14     A   Yes, I did.
15     Q   Okay.  What was the outcome?
16     A   The outcome was, at the end of the
17  deposition they decided to settle with me.
18     Q   Um-hm.
19     A   And that's what occurred.
20     Q   Who was your attorney in that lawsuit?
21     A   It was Bemis Roach & Reed.  It was
22  Mr. Bemis.
23     Q   What type of a lawsuit was it?
24     A   I believe it was in the nature of employment
25  law or something like that.

Page 8

1      Q   Um-hm.  And what was the settlement?
2      A   $15,000.
3      Q   So you did give a deposition?
4      A   Yes, I did.
5      Q   How much of the, of the $15,000 settlement
6  went to your attorney?
7      A   One-third, which is $5,000.
8      Q   So is that the only time you've given a
9  deposition?
10     A   Yes.
11     Q   Was the deposition videotaped?
12     A   No.
13     Q   Is that the only time you've filed a
14  lawsuit?
15     A   Yes.
16     Q   Have you been sued before?
17     A   No.
18     Q   And that was in 2004?
19     A   Yes.  I believe so.  Yes.
20     Q   Were you offered your job back?
21     A   No.  Part of the condition of the settlement
22  was that I was to never speak of it again or seek
23  further employment with Family Dollar.
24     Q   Okay.  And you say you've never been sued
25  before?

2 (Pages 5 to 8)

Travis Casey                                                               August 2, 2010

Page 9

1    A    That's correct.
2    Q    And you've never filed a suit other than
3    that one?
4    A    That's correct.
5    Q    Okay.  What is your date of birth?
6    A    October 2nd, 1970.
7    Q    So you're how old?
8    A    39.
9    Q    And what your driver's license number?
10   A    02419184.
11   Q    Have you had a driver's license anywhere
12   other than Texas?
13   A    Yes.
14   Q    Where?
15   A    Arizona.
16   Q    What's the driver's license number?
17   A    I don't recall.
18   Q    When was that?
19   A    It was for two years between 1996 and 1997.
20   Q    Only two years you had a driver's license in
21   Arizona?
22   A    That's correct.
23   Q    Any other driver's licenses in other
24   jurisdictions?
25   A    No.

Page 10

1    Q    Where are you from?
2    A    Amarillo, Texas.
3    Q    Okay.  How did you -- how long have you
4    resided in -- did you reside in Austin before this
5    incident?
6    A    Yes.
7    Q    How long did you reside in Austin before
8    this incident?
9    A    I moved to Austin in 1998.
10   Q    And why did you move to Austin?
11   A    Because of jobs, economic opportunity in
12   health care.
13   Q    And health care?
14   A    Yes.
15   Q    I don't understand.  What is it about health
16   care in Austin that had you move here?
17   A    That's what I did for a living.  There were
18   better jobs in Austin than in San Antonio where I
19   initially came to sell.  Well, central Texas.
20   Q    So you're from Amarillo, right?
21   A    Yes.
22   Q    And then where did you live?  When you left
23   Amarillo where did you move to?
24   A    Well, I've lived in California.
25   Q    Um-hm.

Page 11

1    A    I've lived in Oklahoma and Arizona.
2    Q    Any other states?
3    A    No.
4    Q    What other cities in Texas have you lived in
5    besides Amarillo, Austin, and San Antonio?
6    A    Houston.
7    Q    What else?
8    A    That's all.
9    Q    Where do you live now?
10   A    In Austin.  Well, no.  I'm sorry.  San
11   Marcos.
12   Q    Do you have any military service?
13   A    No.
14   Q    What is your current e-mail address?
15   A    Small caps T-R-A-V-I-S-C-A-S-E-Y-A-U-S-T-I-N
16   @live.com.
17   Q    What happened to your -- is that your only
18   e-mail address?
19   A    Yes.  It's my only e-mail address.
20   Q    What happened to your previous e-mail
21   address which ended in "myself"?
22   A    I couldn't recall the password to it.  It
23   became overcome with junk mail.  I couldn't really use
24   it, so I set up this e-mail account.
25   Q    Who is the provider for your current e-mail

Page 12

1    account?
2    A    Hotmail.
3    Q    What is your current home phone number?
4    A    (512) 801-8391.
5    Q    And your current work number?
6    A    I don't have a current work number.
7    Q    How about your cell phone number?
8    A    That is my primary number.
9    Q    It's your only number?
10   A    It's my only number.
11   Q    All right.  What's your height and weight?
12   A    I'm 6 foot 5 and approximately 200 pounds.
13   Q    What was your height and weight at the time
14   of the incident?
15   A    6 foot 5, perhaps 220, 225 pounds.
16   Q    What is your gender?
17   A    Male.
18   Q    And your sexual orientation?
19   A    Gay.
20   Q    And your marital status?
21   A    Single.
22   Q    Have you ever been married?
23   A    Yes.
24   Q    When were you married?
25   A    In 1989.

3 (Pages 9 to 12)

Travis Casey                                                                August 2, 2010

Page 13

1    Q   Whom were you married to?
2    A   Sheri Cropper.
3         THE REPORTER:  What was the last
4    name?
5    Q   (By Ms. Edwards) I'm sorry?
6    A   I'm -- Sheri Cropper.  The last name is
7    C-R-O-P-P-E-R.
8    Q   How do you spell the first name?
9    A   S-H-E-R-I.
10   Q   How long were you married?
11   A   About 13 months.
12   Q   Do you have any children?
13   A   No.
14   Q   You've never had children?
15   A   No.
16   Q   Have you ever filed for bankruptcy?
17   A   Yes.
18   Q   When was that?
19   A   I believe it was perhaps in 2003, I think.
20   Q   And tell me about that bankruptcy.
21   A   At that time I had began having serious
22   nauseous episodes that eventually became debilitating.
23   I was having to visit the ER at Brackenridge usually
24   about twice a week that -- I had amassed so many
25   medical bills that it was ruining my credit, and I

Page 14

1    sought bankruptcy as some kind of solution to turn
2    that around.
3    Q   You said -- did you say it was because of
4    severe nauseousness?
5    A   It was eventually diagnosed as abdominal
6    migraines.
7    Q   Okay.  But earlier you said severe
8    nauseousness?  Did I hear you correctly?
9    A   Yes.
10   Q   Okay.
11   A   Severe nausea.
12   Q   Severe nauseousness.  You were at
13   Brackenridge?
14   A   Yes.
15   Q   Several times a week?
16   A   Yes.
17   Q   That began in 2003?
18   A   It actually began in 2001, the episodes of
19   that began.  I didn't file bankruptcy until later.
20   Q   Um-hm.  What debts were you discharging in
21   bankruptcy?
22   A   I don't recall the miscellaneous things, but
23   I had over a hundred thousand dollars in medical
24   bills.
25   Q   What else besides medical bills?

Page 15

1    A   I don't recall.
2    Q   Not at all?
3    A   Hm, no, I don't.
4    Q   Who was your attorney for your bankruptcy?
5    A   Attorney.  I'm sorry.  I don't recall.
6    Q   And you said you're not on any medication
7    today?
8    A   That's correct.
9    Q   What did you do to prepare for this
10   deposition, sir?
11   A   Tried to just get plenty of rest --
12   Q   Um-hm.
13   A   -- and...
14   Q   Did you review any documents to prepare for
15   this deposition?
16   A   No.
17   Q   Did you read your lawsuit?
18   A   No.
19   Q   Have you ever read your lawsuit?
20   A   What are you referring to?  The --
21   Q   The document that's filed on which your
22   lawsuit is based, have you ever read it?
23   A   Of course.  Yes.  I've read it.
24   Q   Okay.  Let's talk about your education.  Did
25   you graduate from high school?

Page 16

1    A   Yes.
2    Q   Where?
3    A   From Amarillo College.
4    Q   Where did you graduate from high school?
5    A   Amarillo College.
6    Q   What year was that?
7    A   It was in '88.
8    Q   How did you happen to graduate high school
9    from Amarillo College?
10   A   At the end of my junior year I went to the
11   junior college, took a placement testing, was already
12   at college level.
13   Q   Did you attend college as a college student?
14   A   Yes.
15   Q   When?
16   A   Intermittently.  The exact dates, years I
17   don't recall, but it's been intermittently for
18   a -- Amarillo College, Pima Community College, Austin
19   Community College.
20   Q   Have you ever earned any degrees?
21   A   No.
22   Q   Not even an associate's degree?
23   A   No.
24   Q   How many hours of college credit do you
25   have?

4 (Pages 13 to 16)

Travis Casey

August 2, 2010

Page 17

1    A    Currently I'm not certain.
2    Q    A year?
3    A    More than a year.
4    Q    More than two years?
5    A    Less than two years.
6    Q    When was the last time you were attending
7    college?
8    A    I believe it was in 2005.
9    Q    Um-hm.  What were you studying for?
10   A    I was getting prerequisites for medical
11   billing and coding.
12   Q    What type of program is that?
13   A    Well, it's a specific program for medical
14   billing and coding.  There are courses that are
15   required, such as human anatomy and physiology for
16   medical assistants.  That's the last course that I
17   successfully completed.
18   Q    Um-hm.  And is that a degree program?
19   A    Yes.
20   Q    What is the degree?
21   A    Medical billing and coding.
22   Q    That's -- is that an associate's degree in
23   medical billing and coding?
24   A    Yes.
25   Q    Okay.  Which you do not have?

Page 18

1    A    No.
2    Q    Let's talk about your work history since
3    high school.  Where have you worked since high school?
4    A    Since high school?
5    Q    Yes.
6    A    I would have to refer to -- since high
7    school, I've had quite a few jobs since high school.
8    I'm not sure I could tell you each place that I've
9    worked exactly --
10   Q    Do your best.
11   A    -- chronologically.  My best?  Okay.  Let's
12   see, after high school I have -- I worked various
13   different jobs such as at the Amarillo Globe News as
14   an inserter; I had worked in food service at Popeye's,
15   Burger King, Mr. Burger; and I had gone to Ware
16   Memorial Care Center.  Went to -- through the course
17   to become to become a -- to prepare me to take the
18   state test for the Department of Health to get
19   registered as a nurse's aide.  I had taken a course at
20   Amarillo College in phlebotomy.  I did not work doing
21   that.
22        So then I began working in health care
23   after that.  I'd worked at Ware Memorial and then
24   Bivins Memorial Nursing Home, then I had gone to work
25   at Northwest Texas Hospital in the psychiatric

Page 19

1    pavilion.  From there I had moved to Arizona.  In
2    Arizona I had worked for the Department of
3    Developmental Disabilities.  I was promoted and
4    transferred into Juvenile Voc Rehabilitation.
5         Upon returning to Texas I went to work
6    in San Antonio at a psychiatric facility as a psych
7    tech.  I had moved to Austin and gone to work for
8    Heritage Duval Gardens and Marriott Brighton Gardens.
9    Both were full-time positions.  I had worked there
10   until -- let's see, after that I had gone to work for
11   St. David's Hospital in neural rehab.  After that I
12   had worked at the Brown Schools, Texas Neural Rehab.
13   I had done home health care for Visiting Angels part
14   time.
15        And then after this incident I was no
16   longer able to pass a background check, so I went to
17   work at a restaurant as a line cook.  Did that for
18   about six months and then went to work at a pizza
19   restaurant as a manager for a little over a year.
20   From there I had gone to work delivering pizzas at
21   Domino's downtown.  After that I had gone to San
22   Marcos and worked at Carino's as a server, and, let's
23   see, I think that covers it.
24   Q    All right.  Then let's go backwards.  The
25   incident was April 30th of 2007, correct?

Page 20

1    A    Yes.
2    Q    Where were you working on that day?
3    A    I was not working at that particular time.
4    Q    Why not?
5    A    I was not working at that particular time
6    because I was still affected by the abdominal
7    migraines that I was suffering from and was unable to
8    work.
9    Q    How long had you been unemployed on April
10   30th of '07?
11   A    The last employment that I'd actually had
12   was with Family Dollar.  I believe that was in 2000
13   and -- 2002, I believe.  After that the incidents
14   became so close together that I was unable to hold
15   down a job, and they were pretty severe.
16   Q    Okay.  And when did you apply for SSI?
17   A    I applied for that, I believe that happened
18   in 2003, I believe.
19   Q    And was it approved?
20   A    Yes, it was.
21   Q    On what basis?
22   A    On the basis of abdominal migraines.
23   Q    Is that the sole condition for which you
24   were given SSI?
25   A    Yes.

5 (Pages 17 to 20)

## Page 21

1    Q   Mr. Casey, I'm familiar with abdominal
2    migraines, but only in children. I've never heard of
3    in an adult a case of abdominal migraines. How would
4    you respond to that?
5    A   I would respond to that by saying that in
6    the abdominal area under the ribcage there's a nerve
7    cluster and also a convergence of the circulatory
8    system. In short, a migraine occurs because the
9    nervous system sends out signals that cause the
10   circulatory system to contract and expand, and this
11   affects your blood pressure and triggers the effects
12   of a migraine. The triggers can be light, sound,
13   heat, motion.
14       In an abdominal migraine the signal is
15   sent there at the exact portion in your body of your
16   circulatory system. You begin to have, like,
17   convulsive contractions that are just horribly
18   painful. They usually are predominantly prevalent in
19   children who may revert to grow up and having them as
20   an adult, but otherwise in their head, but -- where
21   most people, you know, usually have a migraine.
22       It took over a year for the doctors to
23   eventually figure out what was going on. I'd finally
24   seen a neurologist who said in his 30 years of
25   experience he'd never met an adult who actually had

## Page 22

1    them. In fact, there is no treatment modem in the
2    Physician's Desk Reference for it. It just refers to
3    treating it as you would a regular migraine, but they
4    are extremely rare. It's a hereditary condition. I
5    believe I have it because of a recombination from both
6    sides of my family. They occur in both of my parents'
7    history.
8    Q   Having never heard of adult abdominal
9    migraines, I'm not aware that it is on the list of
10   approved illnesses to qualify for SSI for adults. How
11   would you respond to that?
12   A   It surprises me too. They do exist, they're
13   just very rare.
14   Q   Did you find when you went to apply for SSI,
15   did you find that adult abdominal migraines were on
16   the list of conditions that are approved?
17   A   I was unaware that there was any list of any
18   conditions that determined whether someone was
19   approved or not approved. I presented my medical
20   history and my case through an attorney, Phillip
21   Leurway.
22   Q   Can you please spell the last name?
23   A   I believe it's L-E-U-R-W-A-Y.
24   Q   Is he here in Austin?
25   A   Yes. I believe he is -- the last time I was

## Page 23

1    in contact with him his office was on Riverside and
2    35.
3    Q   So he did your SSI for you?
4    A   Yes, he did.
5    Q   How much -- excuse me. And how much do you
6    receive in monthly SSI payments?
7    A   Currently $821. I have -- yes. $821, I
8    believe.
9    Q   When you are not employed do you receive
10   those payments whether or not you are employed?
11   A   Yes. Because I'm in the work trial period.
12   Q   I'm sorry?
13   A   I'm in the return-to-work trial period.
14   Q   What does that mean?
15   A   When your condition begins to improve and
16   you're able to maintain employment they do not cut off
17   your benefits or your health care benefits. They do
18   that to help you transition back into the workforce,
19   and that's what I've been trying to do.
20   Q   All right. So whether you're working or
21   not, your monthly payments are $821 a month; is that
22   correct?
23   A   That's correct.
24   Q   When you are not working is that your sole
25   income?

## Page 24

1    A   Yes.
2    Q   When did you enter the return-to-work trial
3    period?
4    A   I entered it in -- actually, in 2007.
5    Q   And how did that come about?
6    A   It came about because I had no choice but to
7    push through my disability to try to return to work.
8    Despite my injury to my arm and what I was suffering
9    through, to pay for attorneys' fees, living expenses,
10   I had no choice but to try.
11   Q   So did Social Security put you on the trial
12   work period?
13   A   I requested it. Yes. Yes, they did,
14   actually. It's their program.
15   Q   Did you request it, or did Social Security?
16   A   It's not a matter of a request. If you
17   return to work, you've entered into it. There are
18   certain stipulations in the first two years, and then
19   following that there are different set of rules. So
20   it's not a request that you make. If you return to
21   work, you've automatically entered into it.
22   Q   So you just testified falsely when you said
23   "I requested it"?
24   A   No. I didn't testify falsely.
25       MR. FLOCAS: Let me object to the

6 (Pages 21 to 24)

Travis Casey                                                                            August 2, 2010

Page 25

1    mischaracterization. You can answer.
2        THE WITNESS: No. I didn't
3    testify falsely.
4        Q    (By Ms. Edwards) So if I understand you
5    correctly, you returned to work, and once you return
6    to work it's automatic that you're in the
7    return-to-work trial period?
8        A    Yes, it is. It's automatic.
9        Q    How long is the period?
10       A    Five years.
11       Q    So you can continue to receive payments for
12   five years while working; is that correct?
13       A    That's correct.
14       Q    So you have not worked -- at the time of the
15   incident you had been unemployed for five years,
16   correct? Since your lawsuit against Family Dollar?
17       A    Depending on the last date and the
18   information that I provided to you of having worked at
19   Family Dollar, that was the last employment that I've
20   had. So from that period until the time that I had
21   gone to work as a line cook I had just received Social
22   Security benefits.
23       Q    From the date of the incident please tell me
24   everywhere you have worked since April 30th of '07.
25       A    Okay. Since April 30th I had gone to work

Page 26

1    at Ryan's Steakhouse as a line cook.
2        Q    When was that?
3        A    I believe it was in June of '07.
4        Q    How long did you work there?
5        A    Until January of 2009.
6        Q    Full time or part time?
7        A    Full time.
8        Q    In Austin?
9        A    No. Wait a moment. I'm confused. I'm -- I
10   worked at Ryan's Steakhouse for six months. It was in
11   December that I applied for the management position at
12   Sarpino's Pizzeria, and I had worked there for, I
13   believe, 13 months until January of 2009.
14       Q    That's --
15       A    But I ended my employment with Ryan's in
16   December of 2007.
17       Q    So you were a line cook at Ryan's full time
18   or part time?
19       A    Part time.
20       Q    Why weren't you working full time?
21       A    I wasn't working full time at that time
22   because of not feeling well, of trying to push through
23   the disability, trying to return to work full time
24   incrementally and...
25       Q    What was your hourly rate?

Page 27

1        A    Minimum wage. It was 7 -- at that time, at
2    that time I think I was making 7 dollars an hour.
3        Q    When you say "part time," is that 20 hours?
4        A    Yes. 20 hours, 22, 30 hours per week. It
5    would vary upon the needs of the store.
6        Q    Were you -- did you resign, or were you
7    fired?
8        A    I resigned.
9        Q    Why did you resign?
10       A    For the opportunity to use that experience
11   to go into a management position in hopes of making
12   more money at the Sarpino's Pizzeria.
13       Q    When did you start working at Sarpino's?
14       A    In December of 2007.
15       Q    Is that in Austin?
16       A    Yes.
17       Q    What was your position?
18       A    Manager.
19       Q    Full time, part time?
20       A    Full time.
21       Q    What's your hourly rate?
22       A    Starting it was 7 dollars an hour.
23       Q    And you worked there for 13 months?
24       A    Yes.
25       Q    Why did you leave?

Page 28

1        A    I left because it was -- the owner did not
2    follow through on the employment agreement at the time
3    I was employed, and I was doing more work than I
4    thought I was being compensated for at that time. I,
5    um --
6        Q    So you quit?
7        A    I resigned.
8        Q    Is that your last job?
9        A    No.
10       Q    Where did you work next and when?
11       A    After that term of employment I had gone to
12   work at Domino's Pizza.
13       Q    When did you start at Domino's?
14       A    I believe I started there -- just a moment.
15   I don't recall the exact month that I started there.
16       Q    Would have been in 2009, correct?
17       A    Yes. That's correct.
18       Q    How long did you work at Domino's?
19       A    I worked there for three months.
20       Q    What was your position?
21       A    I was delivery driver.
22       Q    Full time or part time?
23       A    It was full time.
24       Q    What was your hourly rate?
25       A    7.25 an hour plus tips.

7 (Pages 25 to 28)

Travis Casey                                                    August 2, 2010

Page 29

1    Q   Why did you leave?
2    A   I left because at that particular location
3  they had -- the student body had left and the hours
4  were cut, and it wasn't as lucrative as it had been
5  initially.
6        VIDEOGRAPHER:   Pardon me.
7  Mr. Casey, the microphone cords will cause static to
8  come through the equipment.
9        THE WITNESS:   Okay.
10   Q   (By Ms. Edwards)  Where did you work next?
11   A   I had gone to work at Johnny Carino's in San
12 Marcos.
13   Q   When was that?
14   A   It was -- I believe it began in August of
15 2009.
16   Q   In what position?
17   A   Server.
18   Q   Full time or part time?
19   A   Part time.
20   Q   How much?
21   A   How much?  Excuse me?
22   Q   How much were you paid hourly?
23   A   Hourly I believe it was 2 dollars and 15
24 cents an hour.
25   Q   Below minimum wage?

Page 30

1    A   Yes.
2    Q   Why did you leave?
3    A   I left because it was not sustaining me at
4  all financially.
5    Q   How long did you work there?
6    A   I worked there for approximately two months.
7    Q   Where did you work next?
8    A   Since then I have not worked.
9    Q   Why not?
10   A   Since -- I've had -- I've been dealing with
11 a lot of depression, a lot of things that have been
12 difficult at that point in my life, because
13 just -- that's why.
14   Q   Um-hm.  And what is the source of your
15 depression?
16   A   The source of my depression is, I'd say, for
17 various reasons that are compounded over the last
18 three years.
19   Q   What is that?
20   A   Excuse me?
21   Q   What is that?
22   A   Specifically?
23   Q   Yes.
24   A   Okay.  Specifically, the ending of a
25 fantastic eight-year relationship, as a result of this

Page 31

1  injury, as result of, slightly before this occurred,
2  the loss of a parent, having to be the primary care
3  provided for that terminally ill parent, having been
4  homeless for two and a half months living in my car,
5  having -- living -- having had to live under
6  indictment for three years, having -- okay.
7    Q   Anything else?
8        MR. FLOCAS:  Do you need a moment?
9        THE WITNESS:  Yes.
10       MS. EDWARDS:  Five minutes?
11       MR. FLOCAS:  Can we take a break?
12       MS. EDWARDS:  Sure.  Absolutely.
13       VIDEOGRAPHER:  We're going off the
14 record, the time is 12:58.
15       (At 12:58 p.m. the proceedings
16 recessed, continuing at 1:06 p.m.)
17       VIDEOGRAPHER:  We're going back on
18 the record.  The time now is 1:06.
19   Q   (By Ms. Edwards)  You've identified several
20 attorneys that you have worked with prior to this
21 incident.  One was your bankruptcy attorney whose name
22 you could not recall.  Do you recall that now?
23   A   No.  I do not.
24   Q   Okay.  And then there was Will Hanson, your
25 employment attorney, and then there was Phillip

Page 32

1  Leurway who was your SSI attorney.  What other
2  attorneys have you had represent you?
3    A   Will Janson was the supervisor from Family
4  Dollar.  That information you just repeated
5  was incorrect.
6    Q   Okay.  Thank you.  Your attorney was Bemis,
7  right?  Your attorney in that case was Bemis?
8    A   From the firm of Bemis Roach & Reed.
9    Q   Yes.  What other attorneys have you worked
10 with?
11   A   Those are the only two.
12   Q   And then prior to your current lawyers you
13 had other counsel in this case?
14   A   Yes.  That's correct.
15   Q   Who was that?
16   A   Bristol Myers.
17   Q   Is that a male or a female?
18   A   Male.
19   Q   Who's Bristol Myers with?
20   A   He's an independent attorney.
21   Q   In Austin?
22   A   Yes.
23   Q   And what, what did you consult Bristol Myers
24 for?
25   A   The criminal charges that were alleged

8 (Pages 29 to 32)

Travis Casey                                                                    August 2, 2010

Page 33

1   against me.
2       Q   So Bristol Myers is a criminal attorney?
3       A   That's correct.
4       Q   How did you know Bristol Myers?
5       A   Bristol Myers was contacted by my ex-partner
6   when my ex-partner had found out I was in jail.
7       Q   Okay.  And was Bristol Myer the only
8   attorney that you had for your criminal case?
9       A   That's correct.
10      Q   And then for your civil case did you have
11  anyone other than the attorneys in this room?
12      A   I had consulted with an attorney, but these
13  are the, these are the only attorneys that I had
14  decided to represent me.
15      Q   Who was the attorney you consulted with?
16      A   Let's see.
17          THE WITNESS:  Do you recall his
18  name?
19          MR. FLOCAS:  Sorry.  I can't
20  answer.
21      Q   (By Ms. Edwards)  Was it Jeff Edwards?
22      A   Yes.  I believe so.
23      Q   I recall you called me one day, Mr. Casey,
24  and you told me you had fired your attorney Jeff
25  Edwards; is that accurate?

Page 34

1       A   Yes.  That's accurate.
2       Q   So he was representing you?
3       A   No.  He was not representing me in any
4   capacity.  He had sent me five letters stating that he
5   was not representing me or advising me or to any
6   effect.
7       Q   Um-hm.  Who drafted this lawsuit?
8          MR. FLOCAS:  Can the witness see
9   that document a little more closely?
10         MS. EDWARDS:  Sure.  Absolutely.
11         MR. FLOCAS:  And may I as well?
12  Are we going to mark it?
13         MS. EDWARDS:  We are.  This is
14  Exhibit No. 1, Plaintiff's Original Complaint.
15      Q   (By Ms. Edwards)  Who drafted that document?
16      A   This is the original document that was filed
17  in federal court, correct?
18      Q   That's correct.  And that's your signature
19  on the last page saying you do not have an attorney.
20      A   It was prepared by a paralegal at that firm.
21      Q   But the firm was or was not representing
22  you?
23      A   They were not representing me.
24      Q   Then why would they draft this very detailed
25  lawsuit for you if they were not representing you?

Page 35

1       A   Because they --
2          MR. FLOCAS:  I'm going to object
3   to that to the extent it calls for both speculation
4   and, I think, begins to intrude on attorney/client
5   matters.  To the extent that it does turn on
6   discussions between you and an attorney, even for the
7   purpose of seeking representation, I'm going to
8   instruct you not to answer that part.
9          THE WITNESS:  Thank you.
10      Q   (By Ms. Edwards)  Go ahead.
11         MR. FLOCAS:  You can answer
12  limited to -- if you need her to ask the question
13  again, that's all right.
14         THE WITNESS:  I believe I have an
15  answer.  It was described to me as charity, because
16  they were appalled at what had happened.
17         MR. FLOCAS:  And I'm going to --
18         THE REPORTER:  Because they were
19  what?
20         MR. FLOCAS:  I'm just going to
21  object to that part as nonresponsive in light of my
22  instructions.  At this point I may have to ask that
23  we no longer get into communications between you
24  and -- between my client and his previous attorney
25  even for the purposes of seeking representation.

Page 36

1       Q   (By Ms. Edwards)  Any other attorneys you
2   consulted to represent you in this lawsuit?
3       A   No.
4       Q   How did you come across Jeff Edwards?
5       A   I had done research online.
6          MS. EDWARDS:  Okay.  Sandy, if we
7   could mark that Exhibit 1 when you have a moment.
8          (Exhibit No. 1 marked.)
9       Q   (By Ms. Edwards)  I'm going to give you a
10  minute to review your lawsuit, sir.  Sir, if you would
11  review your lawsuit.
12         MR. FLOCAS:  I'm sorry.  When you
13  describe that as his lawsuit --
14         MS. EDWARDS:  Yes.
15         MR. FLOCAS:  -- is that the live
16  pleading in the case?
17         MS. EDWARDS:  No.  As I specified
18  earlier, that is Plaintiff's Original Complaint.
19         MR. FLOCAS:  Could we refer to it,
20  then, as the pro se pleading?
21         MS. EDWARDS:  No.  I'm going to
22  refer to it as the Plaintiff's Original Complaint.
23         MR. FLOCAS:  Okay.
24      Q   (By Ms. Edwards)  If you would review it,
25  please.  Take your time, let me know when you're done.

9 (Pages 33 to 36)

Travis Casey                                                    August 2, 2010

Page 37

1    A    Yes. I have looked at this before. I'll
2    review it.
3    Q    Are you done?
4    A    Yes, I'm done.
5    Q    Okay. Looking at page number 2 where you
6    start to lay out the facts of your lawsuit, tell me if
7    there's anything on page number 2 that is not
8    truthful.
9    A    It's all true. There's nothing untruthful.
10   Q    All right. Now, the two officers on that
11   day, Officer Corpus and Officer Rodriguez, were both
12   wearing jeans, a T-shirt, and extremely short hair.
13   How would you describe those two officers as looking
14   like hippies?
15       MR. FLOCAS: I'll object to the
16   extent that the question, it assumes facts not in
17   evidence and is counsel is testifying, but you can go
18   ahead and answer.
19       THE WITNESS: That was not their
20   appearance.
21   Q    (By Ms. Edwards) Well, you just said that
22   this page was truthful, and this page --
23   A    It is truthful.
24   Q    -- says you saw --
25   A    You had told me that they had short hair and

Page 38

1    were clean cut, and that was not the case.
2    Q    What was their appearance?
3    A    They had long hair, they looked dirty. I
4    didn't -- they were wearing some kind of street
5    clothes. There wasn't anything in my mind that would
6    have indicated they were police officers or anything
7    to that effect.
8    Q    Do you recognize the gentleman seated to my
9    right?
10   A    No, I don't.
11   Q    This is Officer Frank Corpus, who was one of
12   the two officers in the incident that day. You do not
13   recognize him?
14   A    No, I don't.
15   Q    You understand that we have photographs from
16   that day, don't you?
17   A    Photographs of, let's see, photographs from
18   the emergency room at Brackenridge?
19   Q    We have photographs from everything. You
20   understand we have photographs, don't you?
21   A    No.
22   Q    Have your attorneys not shown you the
23   photographs that we've produced?
24   A    I was told that there were photographs of me
25   with gravel embedded in my face and blood all over me

Page 39

1    and cuts and --
2        MS. EDWARDS: Object as
3    nonresponsive.
4    Q    (By Ms. Edwards) My question was, have your
5    attorneys not shown you the photographs we've
6    produced?
7        MR. FLOCAS: And I'm going to
8    object to that both because apparently they haven't
9    been produced to us; and secondly, to the extent that
10   it intrudes on the attorney/client privilege.
11   Q    (By Ms. Edwards) Mr. Casey --
12       MR. FLOCAS: We'd love to see the
13   photographs, by the way.
14       MR. HUNTSINGER: Yes. I've asked
15   them.
16       MR. FLOCAS: If you would like to
17   produce them, we'd be happy to take a break right now.
18   Q    (By Ms. Edwards) There are photographs
19   taken of all of the individuals involved in the
20   incident that day, and that would include you and the
21   two officers. Now, if the photographs show that
22   Officer Corpus was practically shaved head, his hair
23   so short, just like today, then that would not be
24   truthful that you said they had long hair, would it?
25       MR. FLOCAS: I'm going to object

Page 40

1    to that to the extent that it assumes facts not in
2    evidence and apparently questions my witness about a
3    document that hasn't been produced in discovery,
4    albeit having been requested. To that extent the
5    witness may answer the question.
6        THE WITNESS: When someone is
7    pointing a gun at you, you see that person. So if
8    Officer Corpus had short hair at that time, it may be
9    a detail that was peripheral to me.
10   Q    (By Ms. Edwards) Of course, when you first
11   saw them no one was pointing a gun at you. You saw
12   two men walking towards you. As you say here, "As I
13   was midway across the parking lot to my car I saw two
14   individuals who looked like hippies." That's what you
15   say in your Plaintiff's Original Complaint. So at
16   that time a gun is not pointing at you.
17   A    I remember seeing a beard, I remember seeing
18   long hair, I remember seeing some scraggly clothes. I
19   saw two individuals come out of what seemed to be
20   nowhere in the bushes yelling, "Hey, you. Hey stop."
21   I did not want to have an interaction with those
22   individuals. I was trying to get into my car for my
23   own safety.
24       MS. EDWARDS: Object as
25   nonresponsive.

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

Travis Casey                                                      August 2, 2010

Page 41

1    Q    (By Ms. Edwards) If the photographs show
2    two clean-cut young men with very short hair and clean
3    clothing of jeans and T-shirts, they didn't look like
4    hippies, did they?
5         MR. FLOCAS:  Objection once more,
6    same grounds.  If you're able to answer, answer.
7         THE WITNESS:  Okay.  My
8    interpretation of what a hippy looks like may differ
9    from your interpretation of what a hippy looks like.
10   Someone who seems unkempt, ungroomed, rough around the
11   edges, so to speak, perhaps that, in my opinion, may
12   be like a hippy at that time that I gave this
13   statement.  So in my opinion, yes, that's what they
14   looked like to me.
15        Q    (By Ms. Edwards) Okay.  If would look at
16   page number 3 of Plaintiff's Original Complaint which
17   has been marked as Exhibit 2, tell me if there's
18   anything on page number 3 that is not truthful.
19        A    It's all the truth.  There's nothing
20   untruthful.
21        Q    All right.  Now, in this complaint, in your
22   first complaint, in paragraph 17 you say your foot was
23   on the brake and the car was not moving, correct?
24        A    That's correct.
25        Q    And you state that you threw your hands up

Page 42

1    and said, "Please don't shoot me," correct?
2         A    That's correct.
3         Q    And then in paragraph number 20 you said, "I
4    put the car in drive and drove away slowly"; is that
5    correct?
6         A    Yes.  That, that's correct.
7         Q    So although you then say in that same
8    sentence you were fearful that you would be killed,
9    you drove away slowly; is that right?
10        A    May I describe how I drove away?  What
11   happened is that after I was shot I had to reach over
12   the steering column with my left hand, put the car
13   into drive.
14        Q    Um-hm.
15        A    It was in, sitting in reverse as I backed
16   out.
17        Q    This mentions nothing here about you backing
18   out, sir.  It says you were -- I'm sorry.  I'm
19   incorrect.  It does say that in the paragraph 16.  In
20   paragraph 21 you say your car was not going fast
21   enough to harm anyone.  Now, a car would barely have
22   to be moving if it hit a person to hurt them; isn't
23   that right?
24        MR. FLOCAS:  I'm going to object
25   to that as both argumentative and speculative.  If

Page 43

1    you're able to answer, go ahead.
2         THE WITNESS:  There was -- at the
3    time that I was shot I was struck from the 9:00
4    o'clock position through the driver-side window of my
5    car to my left.  There was nothing or no one in front
6    of my car.  It was sitting in reverse.  As he moved
7    from the 12:00 o'clock -- after I backed out he was in
8    the 12:00 o'clock position facing me, had the gun
9    pointed at me the second time.  I threw up my hands, I
10   said, "Please, God, don't shoot me," and at that time
11   he began firing rounds into my car, eventually ended
12   up at the 9:00 o'clock position where I was hit.
13        I had to reach over the steering column
14   with my left hand and put my car into drive.  As I did
15   that I had to try -- I mean, the shock of that
16   happening, no.  I did not hit the gas pedal and
17   accelerate away.  I tried to make my way to the exit
18   of the parking lot to where the road leads out of the
19   park was at.  Once I reached that point then I tried
20   to get away as fast as I could, because I needed -- I
21   wanted to get somewhere where I could try to call 911.
22        MS. EDWARDS:  I'm going to object
23   as nonresponsive.
24        THE WITNESS:  Okay.
25        Q    (By Ms. Edwards) I'm going to give you an

Page 44

1    opportunity very shortly to go ahead and give a
2    narrative about what happened, but for now if you
3    could answer my questions, please.
4         A    Okay.  What is your question?
5         Q    I'm going to hand you your amended lawsuit,
6    which is Plaintiff's First Amended Complaint, and
7    we'll mark that --
8         A    Then we're done with -- are we done with
9    this?
10        Q    For now.  And we'll mark that as Exhibit
11   No. 2, and I'm going to give you time to read that
12   over while --
13        A    Thank you.
14        Q    -- the videographer changes the tape.
15        A    Thank you.
16        VIDEOGRAPHER:  This marks the end
17   of videotape number 1.  We're going off the record.
18   The time is 1:24.
19        (At 1:24 p.m. the proceedings went
20   off the record, continuing at 1:28 p.m.)
21        (Exhibit No. 2 marked.)
22        VIDEOGRAPHER:  This marks the
23   beginning of videotape number 2 in the deposition of
24   Travis Casey on August 2nd, 2010.  We're going back on
25   the record, the time is 1:28.

11 (Pages 41 to 44)

Travis Casey                                                                August 2, 2010

**Page 45**

1    Q   (By Ms. Edwards)  Mr. Casey, if you -- have
2    you had time to review your Plaintiff's First Amended
3    Complaint?
4    A   Yes.
5    Q   If you would turn to page 2 where you set
6    out the facts of the incident, paragraph 7 you state
7    you arrived at the park at a 5:36 a.m., correct?
8    A   That is correct.
9    Q   You arrived at the park in pitch black,
10   correct?
11   A   Yes.  That is correct.
12   Q   Were you alone?
13   A   I had, I had my dog with me.
14   Q   And were you with any persons?
15   A   No.
16   Q   Were you meeting someone?
17   A   No.
18   Q   It was pitch black, wasn't it?
19   A   Yes.  It was --
20   Q   You did not have a flashlight on your
21   possession, did you?
22   A   No.  But I believe the sun was starting to
23   come up.  There was ambient light from the sunrise.
24   Q   How often have you been to Walnut Creek Park
25   prior to the incident?

**Page 46**

1    A   Often.  I enjoyed Walnut Creek Park because
2    of the hiking trails, mountain biking there, going
3    there frequently with my partner, taking the pets
4    there, flying my remote-control helicopters, walking
5    there with friends, relatives that would come visit.
6    I would show everyone how wonderful it was.
7    Q   How often do you go when it's pitch black?
8        MR. FLOCAS:  Objection to the
9    extent that it mischaracterizes his testimony, but you
10   can go ahead and answer.
11       THE WITNESS:  Pitch black is not
12   what I would describe it as being.  The -- at 5:36 in
13   the morning it is pretty dark, but it opens at 5:30.
14   So I thought I would go spend some time there that
15   day, and just, I -- just some of the places, the
16   waterfalls, the fossil beds, places --
17   Q   You were in a --
18   A   -- I would go.
19   Q   I'm sorry.  I didn't mean to interrupt you.
20   You were in a relationship at the time?
21   A   Yes.
22   Q   And your partner did not go with you?
23   A   No.  My partner at that time was in Las
24   Vegas.
25   Q   How do you know you went to the park at

**Page 47**

1    exactly 5:36?
2    A   Because of the clock in my car.
3    Q   You checked the time when you arrived?
4    A   Yes.  I happened to look at it and noticed
5    that it said 5:36.
6    Q   You don't remember what two officers look
7    like, but you remember the time was 5:36; is that
8    right?
9        MR. FLOCAS:  Objection to the
10   extent that's argumentative.  You can answer if you
11   can.
12       THE WITNESS:  I do remember seeing
13   the clock, and I do remember seeing the officers to my
14   recollection of what they looked like.  Yes.
15   Q   (By Ms. Edwards)  And you said the park
16   opens at 5:30?
17   A   Yes.
18   Q   Had you often been there that early?
19   A   No.
20   Q   What time do you usually go to the park?
21   A   It would usually be in the afternoon after
22   my partner got off work.
23   Q   How often had you usually been there in the
24   early morning?
25   A   I usually never went there by myself, but if

**Page 48**

1    it was, like, a weekend, we would go earlier in the
2    day and ride the mountain bikes or go hiking, just
3    spend the day there.  Sometimes --
4    Q   How long had -- excuse me.  How often had
5    you been there in the predawn hours before?
6    A   Up until this time of April 30th, 2007, I
7    had lived near Braker and 35 since October of 2004.
8    So I couldn't recollect to you how many times I'd
9    possibly been there and at what specific times of day,
10   but it has been in the morning, the afternoon, and the
11   evening.
12   Q   My question was, how often had you been
13   there in the predawn hours before that day?
14       MR. FLOCAS:  I do believe that's
15   been asked and answered.
16       THE WITNESS:  How often?
17   Q   (By Ms. Edwards)  My question was --
18   A   If I was going to --
19   Q   -- in the predawn --
20   A   -- try to attempt --
21   Q   -- hours.
22   A   Predawn hours?
23   Q   Yes.  And I'm sorry, but --
24   A   I'm --
25   Q   -- if we would not talk at the same time,

GIVENS COURT REPORTING
9532 morgan creek drive  ~  austin  ~  texas  ~  78717 ~ (512) 301-7088  ~  sgivens@austin.rr.com

Travis Casey                                                                August 2, 2010

Page 49

1  because the court reporter can't take us both down.
2      A    Okay.
3      Q    I apologize if I'm doing that, but my
4  question is, in the predawn hours how often had you
5  been there before?
6      A    I don't know.
7      Q    Had you ever been there before in the
8  predawn hours?
9      A    At around this time, around 5:30 in the
10 morning when it opens?  No.  Probably -- no.
11     Q    You'd never --
12     A    I've -- I'd never usually ever gone there
13 that early.  I was just not able to sleep and thought
14 that, you know, getting out and getting some fresh air
15 would be good.  So --
16     Q    What's the earliest you had been there
17 before?
18     A    Oh, we may have gone there before like,
19 maybe, 9:00, between 9:00 and 10:00 in the morning.
20     Q    I'm sorry.  Did you just say that you had
21 only been there about 9:00 or 10:30 in the morning
22 before this day?
23     A    You asked me what was the earliest I had --
24     Q    Yes.
25     A    -- usually ever been there, and it was

Page 50

1  between 9:00 and -- usually between 9:00 and 10:00 in
2  the morning.
3      Q    Okay.  And what are the hours that the park
4  is open?
5      A    I believe it's from 5:30 until 10:00
6  o'clock.
7      Q    What makes you think the park is open at
8  5:30?
9      A    Because of the curfew signs at the entrance.
10     Q    So you're familiar with the signage in the
11 park?
12     A    Yes.  Everyone is, I believe, that can read.
13     Q    What other signs are you familiar with in
14 the park?
15     A    I believe everyone sees the other sign about
16 undercover officers in the park to deter people from
17 doing illegal things there.
18     Q    Anything else?
19     A    The curfew sign and that one are the only
20 ones besides the speed limit sign I believe that I'm
21 aware of.
22     Q    Okay.  All right.  Once you arrived at the
23 park that day how many times did you go back to your
24 car?
25     A    I did not go back to my car that morning.  I

Page 51

1  had gone into the interior of the park.
2      Q    All right.  So your testimony is that once
3  you arrived and you left your car to go to the park
4  you only came back to you car the one time, and that
5  was when you departed the park; is that right?
6      A    That's correct.
7      Q    All right.  So I don't understand how you
8  were hiking and exploring in the dark, Mr. Casey, when
9  you didn't even have a flashlight.
10     A    I didn't need a flashlight.
11     Q    Why is that?
12     A    Because I was familiar with the layout of
13 the park.  I had gone into the interior and circled
14 around a usual hiking trail, and the sun was -- you
15 make it sound as though it was just pitch black from
16 5:36 in the morning until 9:00 o'clock in the morning,
17 and it was not.  The sun was coming up.  There was
18 already ambient light.  It was dark when I arrived,
19 but although it was cloudy and rainy that day, there
20 was -- it was not dark for very long.
21     Q    Certainly by 9:00 o'clock it's not dark, but
22 at 5:36 in the morning it's dark, correct?
23     A    Let's see.  On that particular day.  Yes.
24 It was dark at 5:36 in the morning.
25     Q    But you were hiking in the dark at 5:36 in

Page 52

1  the morning?
2      A    Yes.  I -- yes, I was.
3      Q    Did you see any other cars when you parked
4  there?
5      A    When I arrived at the park I sort of
6  peripherally remember seeing something that looked
7  like an old milk truck, either some square-looking
8  sort of vehicle, and I wasn't really paying much
9  attention, but I thought I saw some people putting on
10 some kind of -- looked like neoprene something, or it
11 looked like swimsuit.  They had -- they also had long
12 hair and beards.  I thought they were just riding,
13 going to ride their bikes, and, you know, I just
14 happened to notice that and then went on into the
15 park.  So, yeah, I do recall.
16     Q    Who else did you see when you arrived at the
17 park?  Not later, but when you arrived.
18     A    I was just describing what I saw when I
19 arrived.  I believe that was the question that you
20 asked me, "What did you see when you arrived?"  That's
21 what I just described to you.  I did not see anything
22 later.  When I returned to my car, in fact, there was
23 no one else, no other car in the parking lot.
24     Q    Okay.  When you arrived did you see anyone
25 else other than what you just described?

GIVENS COURT REPORTING
9532 morgan creek drive ~ austin ~ texas ~ 78717 ~ (512) 301-7088 ~ sgivens@austin.rr.com

Travis Casey                                          August 2, 2010

---

Page 53

1    A   No.
2    Q   And did you see any other vehicles than the
3  one you just described?
4    A   No.  I did not see any other vehicles.
5    Q   Arriving in the dark why didn't you take a
6  flashlight with you?
7    A   I didn't need a flashlight.  To me it was
8  not that dark.  There was ambient light from the
9  sunrise already coming up.  It was dim, of course, but
10  it wasn't so dark that I couldn't make my way through
11  a place that I was familiar with.
12    Q   And you realize that the swimming pool is on
13  the complete opposite end of the park, so there
14  wouldn't be any swimmers where you were parked.  Are
15  you aware of that?  You said you really knew this
16  park.
17    A   Well, yes.  I'm aware of that.
18    Q   Okay.
19    A   Yeah.
20    Q   Let's go through your record, Mr. Casey.
21  How many times have you been arrested?
22        MR. FLOCAS:  I'm going to object
23  to that to the extent that I believe it's going to
24  intrude on both a juvenile matter that I believe
25  you -- have you guys already discussed?

---

Page 54

1        MR. HUNTSINGER:  I don't care
2  about it.
3        MR. FLOCAS:  Okay.
4        MR. HUNTSINGER:  [Inaudible.]
5        MR. FLOCAS:  Then I'll let the
6  witness answer.
7        THE WITNESS:  Yes.  Between
8  sophomore and junior year I was with some friends as a
9  juvenile, and a window of a car was broken and we were
10  prosecuted for it.  We had pleaded guilty to it,
11  served a year of probation, and as far as I thought,
12  it would be a closed matter.  It was about 24 years
13  ago.  Just, is -- what else can I answer to?
14    Q   (By Ms. Edwards)  Any other arrests?
15    A   Okay.  Arrests, yes.  In --
16        MR. FLOCAS:  And obviously, I'm
17  just going to maintain my objection as to the time
18  period and its relevance and admissibility, although I
19  understand that you can be asked about it, and the
20  witness can go ahead and answer.
21        THE WITNESS:  In 19 -- wait.  In
22  two -- 1996 before I moved to Arizona I had closed out
23  my banking account.  I had believed everything was
24  reconciled, but apparently two years later when I
25  returned to Texas to reinstate my driver's license at

---

Page 55

1  the DPS I was arrested out of -- when I tried to do
2  that, and that's when I discovered I'd had a 20-dollar
3  check for Pizza Hut not clear that account.  And I was
4  informed that the bank does not send mail across state
5  lines of that nature, so I was never aware that that
6  had occurred.  I paid a fine, and that's what happened
7  in that incident when I was arrested.
8    Q   (By Ms. Edwards)  Where were you arrested in
9  1996?
10    A   In Amarillo, Texas.
11    Q   In Amarillo?  I'm sorry --
12    A   Yes.  In Amarillo.
13    Q   Why did I think you said California for this
14  hot check?  Am I mistaken?
15    A   Yes.  You're mistaken.
16    Q   Okay.
17    A   Yes.
18    Q   So both of your arrests at this point, the
19  one in high school and the hot check, were both in
20  Amarillo?
21    A   That's correct.
22    Q   Okay.  When you were arrested in Amarillo
23  tell us about that arrest.  What was that, the arrest
24  itself?
25    A   Which one are you referring to?

---

Page 56

1    Q   In high school.
2    A   In high school?
3    Q   Um-hm.
4    A   I believe I answered that question.
5    Q   No.  My question -- you did tell me about
6  the arrest, but I'm telling you about the act of being
7  arrested.  Tell me about that.
8    A   The act of being arrested?  I suppose there
9  were -- I'm not certain why we were pulled over, and I
10  don't, I don't really know -- I believe they thought
11  that we had vandalized a car and --
12    Q   So you were in a car with some other high
13  school students?
14    A   Uh-huh.  That's correct.
15    Q   And you were pulled over by the police?
16    A   Yes.
17    Q   And the police had you step out of the car?
18    A   Yes.  That's correct.
19    Q   And they questioned you?
20    A   Yes.  They questioned us, all of us.
21    Q   And they arrested you?
22    A   Yes.
23    Q   All right.  And then your hot check arrest,
24  tell me about that process when you were arrested.
25    A   Well, the process is, is that when you go in

---

14 (Pages 53 to 56)

Travis Casey                                                    August 2, 2010

Page 57

1  to get your driver's license reinstated if you have a
2  warrant for your arrest, at that time they have an
3  officer who's located there at that facility who takes
4  you to the, I guess, the jailhouse; and then you
5  either post bond or pay your fine, make arrangements
6  to do something of that nature, and that's what I did.
7      Q   Did they arrest you?
8      A   Yes.  I was arrested --
9      Q   Okay.
10     A   -- for that.
11     Q   What other arrests do you have, sir?
12     A   Okay.  Aside from this incident.
13     Q   Aside from the two that you just gave me
14  prior to this incident.
15     A   Okay.  I was also arrested in July of last
16  year, 2009, for --
17            MR. FLOCAS:  Again, I'm sorry.
18  I'm just going to assert my objection as to what the
19  relevance and admissibility, but I understand you can
20  go into it, and please answer the question.
21            THE WITNESS:  Okay.  I had moved
22  back in with the partner that I'd had.  I'd ended the
23  relationship about exactly one year to the date that I
24  had ended up having to move back in because of
25  circumstances that were not good for me, and my

Page 58

1  partner and I had an argument.  It was a verbal
2  escalation, and my partner had asked me to move out.
3  I said, "Give me a 30-day notice."  My partner said,
4  "I'm going to call 911."  I said, "Fine, go ahead,"
5  and my partner did call them.  They showed up, and
6  subsequently, unfortunately, I ended up being arrested
7  and taken to jail.
8      Q   (By Ms. Edwards)  That was --
9      A   -- as a result.
10     Q   -- here in Austin, sir?
11     A   Yes.  Here in Austin.
12     Q   And that was July of 2009?
13     A   Yes.
14     Q   Where were you -- where did the fight take
15  place?
16            MR. FLOCAS:  Objection to the
17  extent that it mischaracterizes his answer.  You can
18  answer.
19            THE WITNESS:  It was, it was at
20  1313 Byers Lane, Austin, Texas 78753.  That's, that
21  was our residence.
22     Q   (By Ms. Edwards)  What was the resolution of
23  that arrest?
24     A   The resolution of that arrest was that it
25  was dismissed.

Page 59

1      Q   And why was it dismissed, if you know?
2      A   It was dismissed because my ex-partner had
3  came into cooperation with my attorney and me to the
4  effect that the record of what had occurred did not
5  actually occur to that nature, that there was no
6  assault that was committed, there was no interference
7  with a 911 call.  So to that effect, it was pretty
8  much dismissed.
9      Q   Did you have an attorney?
10     A   Yes, I did.
11     Q   Bristol?
12     A   No.  Chris, Christopher Holub.
13     Q   Can you spell the last name?
14     A   H-O-L-U-B.
15     Q   How long were you in jail?
16     A   I was in jail for one day, I believe.
17     Q   What other arrests do you have?
18     A   None.
19     Q   What other arrests do you have besides the
20  two you just testified to prior to this incident?
21     A   Just those two and this incident.
22     Q   And the only arrest since the incident is
23  this July 2009 verbal altercation; is that right?
24     A   That's correct.
25     Q   What happened in January of 2001 that the

Page 60

1  police were involved?
2      A   January of 2001.  Um, I don't recall.
3      Q   Were you the victim of a theft?
4      A   The victim of a theft, 2001?  Oh, let's see.
5  Yes.  Yes, I was.  I don't believe that the police
6  helped me with that at all.  They advised me of what
7  to do is to pursue it in small claims court, but I did
8  make a call, I believe, I think.  Or it could have
9  been over some roommate issue.  I believe whatever it
10  was over a roommate issue of some kind.
11     Q   What happened in November of 2001?
12     A   I don't recall specifically what kind of
13  answer you're wanting for that particular date nine
14  years ago.
15     Q   Were you the victim of an aggravated robbery
16  with a deadly weapon?
17     A   No.  I don't believe so.  With an
18  aggravated weapon?  No.  I don't recall that.  I'm not
19  recalling anything of that nature.
20     Q   What happened in December of 2001?
21            MR. FLOCAS:  And to the extent
22  that that question is a little open-ended, I'm going
23  to object to it as vague.  If that's enough for you to
24  recall, that's fine.  If it isn't, that's all right
25  too.

15 (Pages 57 to 60)

Travis Casey                                                  August 2, 2010

Page 61

1    THE WITNESS:  November of 2001,
2  December of 2001?  I don't know where you're leading
3  with all of this, but it's really not making much
4  sense to me.  I'm not understanding what information
5  that you're wanting to, to find out or learn.  I
6  don't, I don't even, I don't even know where you're
7  going with this.  I'm just not understanding it.
8    Q    (By Ms. Edwards)  I asked what other police
9  involvements you've had besides arrests.  What police
10  involvement did you have in December of 2001?
11    A    None that I recall at this moment.
12    Q    Were you the complainant of a criminal
13  trespass?
14    A    The claimant in a criminal trespass?
15    Q    The complainant in a criminal trespass.
16    A    No.  I don't believe so.
17    Q    How about in March of '07?  What was police
18  involvement then?
19    A    I don't recall any police involvement with
20  anything in March of 2007.
21    Q    Were you the victim of a theft?
22    A    No.
23    Q    What police involvement have you had since
24  the incident in April of 2007 other than the verbal
25  altercation you've already mentioned?

Page 62

1    A    None.
2    Q    Mr. Casey, if you would please show your arm
3  to the camera.
4    A    Okay.  May I stand up?
5    Q    Sure.  I think if you remain seated, the
6  camera is already positioned to where you could be
7  seen seated.
8    A    Okay.  This is my arm.  I have a scar that
9  goes from the distal portion here on my arm --
10    Q    Right.
11    A    -- to there.
12    Q    Um-hm.
13    A    It zigzags across.
14    Q    Um-hm.
15    A    The bone here, the cortex in the wrist has a
16  crater in it.  It severed my radial nerve.
17    Q    I just asked to see your arm.  That was it.
18    A    Okay.
19    Q    Is that your only injury from -- oh.
20    MR. FLOCAS:  Can he finish his
21  answer?
22    THE WITNESS:  There and here.
23    Q    (By Ms. Edwards)  Which is the entrance
24  wound from the gunshot?
25    A    This is the entrance wound.

Page 63

1    Q    And the exit wound?
2    A    There is no clear exit wound on my arm.
3    Q    What is that on the inside of your arm?
4    A    That is where a piece of shrapnel started
5  working its way out months later and I had to have it
6  surgically excised.
7    Q    You had surgery at the time of the incident;
8  isn't that correct?
9    A    That's correct.
10    Q    And the physician told you he removed all
11  debris and all shrapnel fragments from the bullet; is
12  that right?
13    A    No.  The physician told me that he debrided
14  the wound, which is just superficial irrigation to
15  remove debris out of it.  No.  I've had fluoroscopic
16  X-ray done, and it's littered with shrapnel and debris
17  from this portion of my arm up to here.
18    Q    In reviewing your medical records, I, and
19  correct me if I'm wrong, in reviewing your medical
20  records I saw that you had surgery that day, but
21  apparently the surgeon did not remove all of the
22  fragments and several months later, or sometime later,
23  you had a second surgery to remove another fragment;
24  is that correct?
25    A    That's correct.

Page 64

1    Q    All right.  So it was actually the surgeon
2  who missed something in the first surgery that was
3  caught in the second surgery; is that accurate?
4    MR. FLOCAS:  Objection to the
5  extent that calls for a medical conclusion that this
6  witness isn't qualified to offer.
7    THE WITNESS:  I would like to
8  correct you for being wrong, because there's no
9  possible way to remove the matter, the foreign matter
10  that's in my body.  From here to here there was so
11  much of it that it would be impossible even with
12  orthoscopic surgery.  I would bleed to death, I would
13  lose my arm.  That's what has been stated to me by a
14  physician.
15    Q    (By Ms. Edwards)  Is that written in,
16  anywhere --
17    MR. FLOCAS:  Objection to that as
18  nonresponsive as well.  Please continue.
19    THE WITNESS:  It was in response
20  to a question I had asked a plastic surgeon about
21  getting the foreign matter out of my hand --
22    Q    (By Ms. Edwards)  Is --
23    A    -- my arm.
24    Q    I'm sorry to interrupt you.  Is that written
25  anywhere in your medical records?  Because I see no

16 (Pages 61 to 64)

Travis Casey                                                                August 2, 2010

Page 65

1    record of that.
2        A    You --
3            MR. FLOCAS:  If he's going to be
4    asked about the document, I would just ask that he
5    have an opportunity to examine it.
6            THE WITNESS:  I believe that you
7    may find evidence of the fluoroscopic X-ray in
8    Dr. Sharma's medical records that I submitted to you.
9        Q    (By Ms. Edwards)  I have not been provided
10   with any X-rays, sir.
11       A    Okay.
12       Q    But I've read all the reports, and I saw
13   nothing in the report indicating what you've just
14   testified to, only the fact that the first surgeon did
15   not remove all the fragments and a second surgeon did
16   so on a later date.  So I see nothing in the medical
17   records that describes what you've just testified to.
18   Can you explain that?
19           MR. FLOCAS:  I'm going to object
20   to the extent that it's been asked and answered.  If
21   you have an answer, please feel free to give it.
22       Q    (By Ms. Edwards)  Can you explain that, sir?
23       A    Yes.  Initially, the initial surgeon who
24   tried to repair the damage was trying to repair what
25   he could circulatorywise.  It was not a surgery that

Page 66

1    was, that was -- okay.  No.  The first surgeon did not
2    remove the shrapnel from my arm.  The second surgeon
3    removed a large piece of shrapnel that was working its
4    way from the soft tissue in my arm out.  It was
5    starting to open up and come out and was becoming
6    infected.  I had to seek medical treatment to have
7    that piece removed.
8            So I'm not certain why you would
9    believe what you do or that you've read from my
10   medical records, because I believe that it's there if
11   you were able see it.
12       Q    So having gone through your arrest record,
13   you lied to the police that day when you said you'd
14   never been in trouble before, didn't you?
15           MR. FLOCAS:  Objection, that's
16   argumentative.  You can answer.
17           THE WITNESS:  Lied to the police?
18   I don't recall lying, lying to the police saying that
19   I haven't been in trouble before.  I was more
20   concerned about my dog in a car with the blood and the
21   trauma that I had just undergone.  So, no, I don't
22   recall even making that statement.
23       Q    (By Ms. Edwards)  If you did make that
24   statement, it would have been a lie, wouldn't it?
25   Because you have been in trouble before, correct?

Page 67

1            MR. FLOCAS:  Again I'm going to
2    object to that as both argumentative and speculative.
3            THE WITNESS:  24 years ago as a
4    juvenile?  Yes.  Unknowingly had a check bounce from
5    Pizza Hut from closing out a bank account?  Yeah.  But
6    getting shot, something like that?  No.
7        Q    (By Ms. Edwards)  And your concern for your
8    dog, you left your dog in the car for three and a half
9    hours, didn't you?
10       A    The window of my car was cracked for
11   ventilation on both sides.  It was cloudy and rainy
12   and cold.
13           MS. EDWARDS:  Object as
14   nonresponsive.
15       Q    (By Ms. Edwards)  My question was, you left
16   your dog in the car for three and a half hours; isn't
17   that correct?
18       A    Yes.
19       Q    And in Austin that's a violation; isn't that
20   correct?
21           MR. FLOCAS:  Objection to the
22   extent it calls for a legal conclusion.  If you know,
23   you can answer.
24           THE WITNESS:  Do I have to answer?
25           MR. FLOCAS:  If you know the

Page 68

1    answer to the question, you can answer it.  If you
2    don't know, you don't have to answer.
3            THE WITNESS:  Okay.  Yeah.  Yes.
4    Oh, well, it's just -- no.  I'm not certain.  Could
5    you repeat the question specifically?
6        Q    (By Ms. Edwards)  No.  I'll move on.
7        A    Okay.
8        Q    Let's talk about your medical history, sir.
9    You have hepatitis C; is that correct?
10       A    That is correct.
11       Q    And you're a heavy smoker?
12       A    Not so much anymore.  No.
13       Q    You have been a heavy smoker for most of
14   your life, correct?
15       A    No.  That's not correct.
16       Q    When were you a smoker?
17       A    I was a smoker --
18       Q    At the time of the incident you were a heavy
19   smoker, correct?
20       A    Yes.  At the time of the incident I did
21   smoke cigarettes.
22       Q    You also are bipolar, sir?
23       A    No.  That's incorrect.
24       Q    The medical records that indicate you're
25   bipolar are incorrect?

17 (Pages 65 to 68)

Travis Casey                                                    August 2, 2010

Page 69

1    A   They're incorrect.
2    Q   How is that appearing on your medical
3  records?
4    A   It appears on my medical record as a
5  misdiagnosis.
6    Q   Can you explain that, please?
7        MR. FLOCAS:  If you're able to
8  explain the circumstances of that, that's fine.  If
9  you do not have the medical knowledge, that's fine as
10  well.
11        THE WITNESS:  The circumstances
12  behind that diagnosis are vague to me, are not, are
13  not legitimate.  I have, I have -- since that
14  diagnosis I have sought other health care
15  professionals to make that ascertation or that
16  diagnosis, and they said, "No.  You are not bipolar.
17  You do not have bipolar disorder."
18    Q   (By Ms. Edwards)  When were you diagnosed as
19  bipolar?
20    A   I was diagnosed by a doctor, I believe, with
21  that disorder in, I think -- I'm not certain when I
22  was diagnosed with it.
23    Q   Approximately when were you diagnosed?
24    A   Approximately, perhaps, 2004.
25    Q   You have abdominal migraines?

Page 70

1    A   Yes.
2    Q   From when was the first onset of your
3  abdominal migraines?
4    A   The first onset of them began in December
5  of, I believe it was, December of 2001.
6    Q   Do they continue?
7    A   No.  They haven't continued.
8    Q   When did they conclude?
9    A   I stopped having them sometime in 2007.
10    Q   And you also suffer from anxiety and
11  depressive disorder?
12    A   Yes.
13    Q   Since when?
14    A   I don't recall since, since when.
15    Q   Approximately when?
16    A   Approximately when?  An approximation, I
17  would say intermittently throughout my life.  Probably
18  since, since I became debilitated with the abdominal
19  migraines.  I believe that started occurring perhaps
20  in -- by 2003 or so.
21    Q   What other conditions have you had prior to
22  this incident, Mr. Casey, medical conditions?
23    A   Would you ask me specifically?
24    Q   What other medical conditions have you had
25  prior to this incident other than the ones I just

Page 71

1  asked you specifically about?
2    A   I've had surgery on my ankle from being
3  broken.
4    Q   When was that?
5    A   It was in 1985.
6    Q   How'd you break it?
7    A   I was doing the high jump and I just came
8  down on it wrong.
9    Q   What else?
10    A   I had an appendectomy in 1979.
11    Q   What else?
12    A   I've had no other surgeries aside from that.
13    Q   What other major illnesses?
14    A   Could you ask me specifically, what other --
15    Q   Other than routine illnesses, something you
16  would have had a treatment for, gone to the hospital
17  for.
18    A   Such as strep throat or the flu?
19    Q   Something beyond that.
20    A   Okay.  Sure.  Okay.  I discovered that I was
21  HIV positive.
22    Q   When was that?
23    A   I discovered that in 2000 and, let's see, I
24  believe, I believe it was in around, like, January of
25  2002.

Page 72

1    Q   Any other conditions, sir?
2    A   No.
3    Q   Having gone through the medical records for
4  the -- for this incident, I don't see where you
5  disclosed to any of the medical professionals that you
6  were HIV positive, sir.
7    A   I don't see why you would think that that
8  would be in a medical record or that I didn't disclose
9  it to them, that they were unaware of any --
10    Q   Did you disclose it to the police or anyone
11  trying to treat you at the scene?
12    A   Yes.  I believe so.
13    Q   To whom?
14    A   I remember stating it to an officer or
15  someone who was -- I don't know if it was an -- I
16  believe maybe it was someone who was trying to give me
17  some kind of initial treatment to put some compression
18  on the wound site.  Yeah.  I disclosed it.
19    Q   Have you reviewed any of the police records
20  from that incident, sir?
21    A   No.
22    Q   The vehicle that you were driving that day,
23  were you the vehicle owner?
24    A   Yes, I was.
25    Q   Did you recover the vehicle?

18 (Pages 69 to 72)

Travis Casey                                                                 August 2, 2010

Page 73

1      A     A month later, yes.
2      Q     Where's the vehicle now?
3      A     I do not know where the vehicle is
4  currently.
5      Q     What did you do with the vehicle?
6      A     The vehicle, I sold the vehicle for scrap.
7      Q     When you were arrested, in addition to your
8  one gunshot wound to your wrist what other injuries
9  did you have?
10     A     In addition to that injury, I had blast
11 injuries from my window exploding, my driver-side
12 window exploding across my face and my body.
13     Q     What were the blast injuries specifically?
14     A     Glass moving at a high rate of velocity
15 across my body.
16     Q     What was your injury from the blast?
17     A     Cuts, scrapes, and abrasions.
18     Q     What other injuries did you have at the time
19 of your arrest?
20     A     I had a -- I remember the detective pointing
21 at a particular scratch across my arm or someone
22 asking, "Where did that come from?" And that
23 particular scratch actually came from a pet that I
24 had.
25     Q     What pet?

Page 74

1      A     A ferret.
2      Q     Any other injuries?
3      A     No.
4      Q     Mr. Casey, the photographs show that you had
5  dozens of scratches on your arms and legs. How do you
6  explain that?
7      A     I explain it from the glass exploding on the
8  driver-side window of my car and going across my body.
9  The bullet apparently struck me on my right side. If
10 I'm sitting in my car, all of that stuff had a
11 trajectory across me. So that's how I account for
12 those scratches, cuts, and abrasions.
13     Q     All right. So other than the blast injuries
14 and the bullet hole, you had one scratch on your arm
15 from a ferret?
16     A     Yes.
17     Q     How many ferrets did you own?
18     A     Three.
19     Q     And all of the other injuries you allege
20 were from -- were blast injuries? You had nothing
21 other than -- before you arrived -- so before you
22 arrived at the park you're saying you had one scratch
23 on your arm from a ferret?
24     A     Yes.
25     Q     And which arm would that be?

Page 75

1      A     I don't recall.
2      Q     Okay. You were released from the
3  hospital -- let's see, this incident was on April
4  30th. Were you released on May 1st?
5      A     I was released on April 30th.
6      Q     Same day?
7      A     Yes.
8      Q     And were you released to the jail?
9      A     I was released into the custody of, I guess
10 they were officers. So yes.
11     Q     And they took you to the jail?
12     A     Yes. That's correct. Central booking.
13     Q     Mr. Casey, you also have tachycardia; is
14 that right?
15     A     What's that?
16     Q     A heart condition.
17     A     No, I don't.
18     Q     Other than on April 30th when you had the
19 first surgery on your wrist and then you had the
20 second surgery on July 17th, did you have any other
21 surgical procedures for your wrist, for your gunshot
22 wound?
23     A     No.
24     Q     Okay. Did you have any other kind of
25 treatment other than surgery for your gunshot wound?

Page 76

1      A     No.
2      Q     Were you in therapy --
3      A     Oh.
4      Q     Go ahead. I'm sorry.
5      A     Yes, I did. I was attending physical
6  therapy.
7      Q     Okay. My next question was going to be did
8  you go into physical therapy?
9      A     Yes, I did.
10     Q     Did you complete your physical therapy?
11     A     Yes, I did.
12     Q     Did you show up for all your doctor
13 appointments and therapy treatments?
14     A     Yes. To the best of my ability, yes, I did.
15     Q     Did you follow your treatment plan?
16     A     Yes, I did.
17     Q     What did your last water test show?
18            MR. FLOCAS: Do we have a copy of
19 that?
20            THE WITNESS: A water test?
21     Q     (By Ms. Edwards) Um-hm. You do not know
22 what that is?
23            MR. FLOCAS: I'm just going to ask
24 if this is a medical record, if he could have an
25 opportunity to examine it without --

19 (Pages 73 to 76)

Travis Casey                                                              August 2, 2010

Page 77

1        THE WITNESS: I believe that --
2        MR. FLOCAS: -- being asked about
3   it.
4        THE WITNESS: -- part of the
5   therapy that I got was inadequate. It --
6        MR. FLOCAS: Actually, I'm just
7   going to ask you to hold on a second, Travis. If he's
8   going to be asked about a medical record, I'd like him
9   to have an opportunity to see it.
10       MS. EDWARDS: I have no medical
11  records other than the ones you've produced today.
12       MR. FLOCAS: And apparently,
13  you're asking about one of them?
14       MS. EDWARDS: No. I'm not asking
15  about a medical record.
16       MR. FLOCAS: Okay. So I guess you
17  referred to a water test, which I took to be a medical
18  test.
19       MS. EDWARDS: And you're wrong.
20       MR. FLOCAS: Okay. In that case,
21  would you let me know the basis for your belief that
22  there's been a water test?
23       MS. EDWARDS: The medical records.
24       MR. FLOCAS: So it is, it is
25  within the medical record then.

Page 78

1        MS. EDWARDS: What's your
2   objection under the rules?
3        MR. FLOCAS: That the witness is
4   being questioned about a document which --
5        MS. EDWARDS: No. He's not being
6   questioned about a document.
7        MR. FLOCAS: He is being
8   questioned about a document, and I'd like him to have
9   an opportunity to see it.
10       MS. EDWARDS: The documents were
11  produced by the witness. If he did not review them
12  before he produced them, that's not my responsibility.
13       MR. FLOCAS: If you'd like to ask
14  my witness about a document, I think we're allowed to
15  examine it.
16       MS. EDWARDS: No. I'm not going
17  to ask him about a document, and I'm going to ask you
18  to stop interrupting the deposition unless you have an
19  objection that falls within the rules. You've stated
20  your objection. Unless you're instructing the witness
21  not to answer, he's going to answer the question.
22       MR. FLOCAS: I'd like a page and
23  line reference for myself --
24       MS. EDWARDS: Fine.
25       MR. FLOCAS: -- so that I may

Page 79

1   examine it.
2        MS. EDWARDS: That's fine.
3   CERTIFIED QUESTION:
4        Q    (By Ms. Edwards) What did your last water
5   test show?
6        MR. FLOCAS: And again, I'm just
7   going to ask my witness to take a moment. This really
8   could probably be resolved very simply with a very
9   brief break so that we could go to the record and have
10  an opportunity for both counsel and the witness to
11  know, and I'm just going to ask you for the
12  opportunity to do that.
13       MS. EDWARDS: I'm going to ask
14  that the witness answer the question. It's that
15  simple.
16       MR. FLOCAS: I am going to object
17  to the extent he's being asked about a document that
18  he does not have an opportunity to examine.
19       MS. EDWARDS: And I'm going to
20  tell you again he's not being asked about a document.
21  I have not asked about a document. I'm asking him
22  about his therapy.
23       MR. FLOCAS: Which you do agree is
24  reflected in --
25       MS. EDWARDS: Counsel, your

Page 80

1   objection is on the record.
2        MR. FLOCAS: Okay.
3        MS. EDWARDS: So you're either
4   going to instruct the witness not to answer and I'm
5   going to certify the question, or you're going to stop
6   interrupting.
7        MR. FLOCAS: Well, what I -- I was
8   hoping we could resolve it a bit more simply, but in
9   that case I don't want him to answer the question.
10       MS. EDWARDS: Sandy, if you would
11  certify the question.
12       Q    (By Ms. Edwards) Sir, do you know what a
13  water test is?
14       A    I never received a water test in my therapy.
15       Q    A water test is not something you would
16  receive, sir. It's part of your therapy that you're
17  supposed to be performing at home yourself. Are you
18  not performing your water tests?
19       A    I was not instructed to perform a water
20  test.
21       Q    But you said you're following your therapy.
22       A    My therapy included exercises and other
23  things that would help with my motor function, but it
24  did not include a water test. The --
25       Q    Excuse me. Mr. Casey, that high school

20 (Pages 77 to 80)

Travis Casey                                                            August 2, 2010

**Page 81**

1  arrest that you referred to, was that in 1988?
2      A   Yes.
3      Q   It involved more than just breaking a
4  window, wasn't it?  Burglary of a vehicle?
5      A   It was vandalism to a vehicle.  The initial
6  charge was reduced to criminal mischief.
7      Q   Who is Mark Gillespie?
8      A   Mark Gillespie is the forensics investigator
9  who analyzed my car after I got it back from Southside
10 Towing a month later.
11     Q   Who retained Mark Gillespie?
12     A   I retained Mark Gillespie.
13     Q   How did you know Mark Gillespie?
14     A   I was brought into contact with Mark
15 Gillespie through Bristol Myers, my attorney.
16     Q   How did you pay Mr. Gillespie?
17     A   Cash.
18     Q   How much?
19     A   $500 down and $75 an hour for his analysis
20 and study on my car.
21     Q   What was the total?
22     A   Oh, I believe it was -- he just charged
23 me -- that, that was the agreement.  Let's see, he
24 just charged me $500, actually, to just do the entire
25 thing.

**Page 82**

1      Q   That was the total?
2      A   Yes.  I believe that was the total amount I
3  ended up paying him.
4      Q   Where did you get the $500?
5      A   I must have been thinking that an
6  association in my memory with Mark Gillespie in that
7  aspect of what I had to pay him.  I think -- that's
8  why I thought $500.  It was actually $75 an hour, and
9  it came to $500 total.
10     Q   My last question was, where did you get the
11 $500?
12     A   My partner gave me --
13     Q   Who was your partner?
14     A   Aaron Milligan.
15     Q   Can you spell that, please?
16     A   A-A-R-O-N, M-I-L-L-I-G-A-N.
17     Q   What is his date of birth?
18     A   His date of birth is November 17th, 1971.
19     Q   What does he do?
20     A   He is a portfolio manager for Capital
21 Certified Development Corporation.
22     Q   What is Capital Certified Development
23 Corporation?
24     A   Economic -- they, they manage loans for
25 commercial and business -- commercial real estate

**Page 83**

1  business loans, high, um --
2      Q   Was he your roommate at the time of the
3  incident?
4      A   No.  He was my partner, my significant
5  other.
6      Q   Was he also your roommate?  Were you living
7  together at the time of the incident?
8      A   Yes.  We both resided at 1313 Byers Lane.
9      Q   And this is the eight-year relationship you
10 referred to?
11     A   Yes.
12     Q   What was your primary means of support?  Was
13 it Mr. Milligan?
14     A   Once I was unable to work and maintain my
15 own job, yes, Mr. Milligan supported me.  In an effort
16 to contribute to my household I had applied for the
17 Social Security disability.
18     Q   What medication were you on the day of
19 the incident?
20     A   On the day of the incident I don't recall
21 what medications I was on at that time.
22     Q   Were you on any medication?
23     A   I don't recall that I was on any medication
24 at that time.
25     Q   Were you on any prescribed medications?

**Page 84**

1      A   I may have had some prescribed medications
2  at that time, or PRN, on an as-needed basis.  I don't
3  recall at this time.  I -- that was, um, three years
4  ago.  I don't recall what medications I may have had
5  at the time.
6      Q   Had you been drinking?
7      A   No.
8      Q   What about drugs?
9      A   No.
10     Q   Do you use drugs?
11     A   No.
12     Q   Have you ever?
13     A   In my early 20s I guess experimented some,
14 but no.
15     Q   What about marijuana?
16     A   No.
17         MS. EDWARDS:  How about a short
18 break?
19         MR. FLOCAS:  Sure.
20         VIDEOGRAPHER:  This marks the end
21 of videotape number 2.  We're going off the record,
22 the time is 2:18.
23         (At 2:18 p.m. the proceedings
24 recessed, continuing at 2:29 p.m.)
25         VIDEOGRAPHER:  This marks the

21 (Pages 81 to 84)

Travis Casey                                                          August 2, 2010

Page 85

```
 1   beginning of videotape number 3 in the deposition of
 2   Travis Casey on August 2nd, 2010.  Back on the record
 3   the time is 2:29.
 4        Q    (By Ms. Edwards)  Mr. Casey, you said you've
 5   not reviewed any of the photographs in this incident;
 6   is that right?
 7        A    That is correct.
 8        Q    If you would just tell us generally about
 9   the incident from start to finish, I may stop you with
10   some questions or I may let you tell the whole story
11   and then come back with some questions.  So from the
12   time you arrived at the park at 5:36 a.m.
13        A    Okay.  I had arrived at 5:36 a.m.  I had
14   gotten out of my car, walked across the street, went
15   into the trails, followed a central route into the
16   interior to -- off to the, to the right, which would
17   be the west side of the park, and just spent some time
18   in different areas along the way there that are nice
19   to spend time in.
20             I had walked back up the west side of
21   it heading north.  I came out of it, I started
22   approaching my car coming across the parking lot.
23   Let's see.  As I was probably about 20, 25 feet away
24   from my car I started hearing someone yelling.  I
25   looked up and I saw two individuals sort of coming out
```

Page 86

```
 1   of some obscure place, like, way across the parking
 2   lot where there's a grassy sort of area in the central
 3   part of it, and then it's like a horseshoe shape.
 4   They were on the other side of that horseshoe thing.
 5             I was startled by it.  I had heard them
 6   going, "Hey, stop.  You stop," and it didn't seem like
 7   a very safe situation.  I looked around, my car was
 8   the only one in the parking lot, I realized I was
 9   alone.  I went to try to get into my car, tried to
10   lock the door.  As I did that they approached my car.
11   One of them came around to the side and hit the
12   driver-side window.  As I looked up from that the
13   other one was standing in front of my car holding a
14   gun, pointing it at me.
15             I just had a moment to think, Oh, my
16   gosh.  I had started the ignition of the car.  I
17   maintained eye contact with the guy who was holding
18   the gun on me.  I put my car in reverse, and I slowly
19   backed out.  After I'd turned my steering wheel to the
20   left so that my car would be facing the exit, the
21   individual got in front of my car at that time when my
22   car came to a complete stop while in reverse.  At that
23   time with my foot on the brake I threw my hands up.  I
24   said, "Please don't shoot me."  The officer began
25   shooting at my car parked until he got around to the
```

Page 87

```
 1   9:00 o'clock position and shot me through the
 2   driver-side window of my car.
 3             I reached over the steering column with
 4   my left hand, put it into drive.  The shock of what
 5   happened I was barely able to sort of steer the
 6   steering wheel.  I believe that the bullets that went
 7   through the hood of my car, they damaged internal
 8   components of the car, the steer -- the power
 9   steering.  That's why it was difficult, that's why I
10   had to go slow.  I couldn't steer the car, it was
11   damaged.
12             I got to the exit of the parking lot
13   where it leads to the main road that leaves the park,
14   and I accelerated to get out of there to try to call
15   911.  I, I had gone out to Parmer, down to Lamar.  I
16   started feeling kind of dizzy.  I felt like I was
17   going to pass out at that time, so I thought I needed
18   to get, I needed to get somewhere so someone could
19   find me.  I went over to a crossover between Lamar and
20   the frontage of 35 where there was some construction
21   going on with some construction cones, and I pulled my
22   car over there and I turned on my hazard.
23             I had started hearing sirens at that
24   time.  I thought it was from someone calling their
25   cell phone, at the intersection of Parmer and I-35
```

Page 88

```
 1   they had seen me speeding and called the cops.  And so
 2   while I was there they pulled up behind.  I got out of
 3   the car and they instructed me to put my hands up,
 4   then put me down on the ground and proceeded to take
 5   me into custody, call an ambulance, and I was taken to
 6   Brackenridge in an ambulance and I was...
 7        Q    What time -- so you were there three and a
 8   half hours?  From the time you arrived till the time
 9   you went back to your car you were there three and a
10   half hours; is that right?
11        A    Approximately.  Yes.
12        Q    Why did you leave your dog in the car?
13        A    Because she was sleepy.
14        Q    Were the doors locked?
15        A    Yes.  They were locked.
16        Q    Why did you take your dog to the park?
17        A    Because she basically went everywhere with
18   me.  Usually walked with me there, but she was
19   sleeping and it was dark, and I didn't want her
20   to -- she couldn't, probably couldn't have seen where
21   she was going.  It was...
22        Q    Did you use the restroom while you were
23   there?
24        A    No.
25        Q    It was too dark for your dog to see, but you
```

22 (Pages 85 to 88)

Travis Casey                                                        August 2, 2010

Page 89

1   could see just fine; is that right?
2        A   I was familiar with the terrain. My new
3   puppy was not.
4        Q   And when you go into the woods it's even
5   darker than it is when you're not in the woods; isn't
6   that correct?
7        A   I was not in the woods. There is a trail
8   that goes alongside the woods, and if you follow that,
9   there's a main trail that leads into the interior that
10  is wide and not wooded.
11       Q   But it's darker in the interior, is it not?
12       A   I would say it would be darker in the
13  interior of a wooded area as opposed to outside of it.
14  Yes.
15       Q   What'd you do for three and a half hours?
16       A   For three and a half hours I made my way to
17  specific points of places that I spent time with
18  different family members there, my partner, fossil
19  beds. I always try to collect something from going
20  and visiting there. I had walked until I got to an
21  end point where there's a waterfall and then made my
22  way back up along the west side of the park heading
23  north, just back to my car. Just took my time, was
24  just walking.
25       Q   Did you have any water with you?

Page 90

1        A   Water?
2        Q   Um-hm.
3        A   No. I didn't have any water with me that
4   morning. I wasn't -- no. I didn't bring any water
5   with me.
6        Q   So you were empty-handed when you walked out
7   of your car?
8        A   Yes. I believe so.
9        Q   And you were empty-handed when you walked
10  back to your car?
11       A   That's incorrect. I wasn't empty-handed
12  when I walked back to my car.
13       Q   What did you have?
14       A   I had a set of antlers, a six-point rack
15  that I found from a -- some kill, and it was bleached
16  already, and I thought I would bring that home.
17       Q   Who did you see when you walked around for
18  three and a half hours?
19       A   No one.
20       Q   Never saw a single person?
21       A   No.
22       Q   Didn't have an encounter with a male in the
23  woods?
24       A   No.
25       Q   So if Sergeant Becker says that you exposed

Page 91

1   yourself to him and assaulted him in the woods, is he
2   lying?
3        A   Yes. That did not occur.
4        Q   And if Officer Rodriguez and Officer Corpus
5   say that they identified themselves to you as police
6   officers and told you to stop, are they lying?
7        A   Yes. I did not see a badge, any
8   police-issued anything. No.
9        Q   Why would all these officers who don't even
10  know you just be lying about you, Mr. Casey?
11           MR. FLOCAS: Objection to the
12  extent it calls for speculation or argumentative. You
13  may answer.
14           THE WITNESS: I can't make a -- I
15  can't honestly answer that. I have no idea what may
16  or may not be going through another individual's mind
17  that's not my own.
18       Q   (By Ms. Edwards)  Is this just some sort of
19  a vast right-wing conspiracy against you?
20           MR. FLOCAS: Objection to the
21  extent that's argumentative.
22           THE WITNESS: I wouldn't speculate
23  along those lines or that kind of nature.
24       Q   (By Ms. Edwards)  Okay. And if Sergeant
25  Becker had injuries that day consistent with you

Page 92

1   assaulting him, how would you explain that?
2            MR. FLOCAS: And I'll object to
3   that as calling for speculation.
4            THE WITNESS: I -- could you
5   repeat your question? I'm --
6        Q   (By Ms. Edwards)  If Sergeant Becker had
7   injuries that day consistent with you assaulting him,
8   how would you explain that?
9        A   I have no explanation, because it couldn't
10  be consistent with me assaulting him, because I did
11  not assault him. So in my mind there is no
12  consistency to his claim. It did not occur.
13       Q   You never even saw him?
14       A   I did not assault Sergeant Becker. So, no,
15  his injuries, no, not consistent.
16       Q   Well, Sergeant Becker says that you exposed
17  yourself to him, and you deny that?
18       A   Yes.
19       Q   And Sergeant Becker says that you grabbed
20  his private parts. You deny that?
21       A   I deny that.
22       Q   Sergeant Becker says he told you he was
23  police and you were under arrest. Do you deny that?
24       A   Yes. I deny that.
25       Q   And Sergeant Becker says you then shoved

23 (Pages 89 to 92)

Travis Casey                                                    August 2, 2010

Page 93

1  him, and he has the injuries and the photographs to
2  show that. Do you deny that as well?
3      A  I deny that as well.
4      Q  All right. So any idea how that happened?
5          MR. FLOCAS: Object to the fact
6  it's been asked and answered.
7          THE WITNESS: I don't know what
8  may have been pre, preexisting condition, if it
9  happened as a result of something else; but no, I
10  don't believe that any injury he may or may not have
11  had was a result of anything he claims that I did or
12  didn't do, based on the fact that if I was injured on
13  the job, I would go seek medical care right away and
14  that not, like, after -- I don't know. No. I have no
15  explanation for it. I don't know why he would claim
16  that I injured him when I clearly did not.
17      Q  (By Ms. Edwards) You never even saw him, is
18  your testimony.
19      A  That's correct.
20      Q  So how did he happen to give your
21  description to APD if you never saw him?
22      A  Perhaps he saw me. From my understanding,
23  they were having a sex-sting operation going on in the
24  park that morning. Perhaps the individuals I
25  peripherally saw to the right were those individuals.

Page 94

1  I have no idea.
2      Q  Um-hm.
3      A  I wasn't really paying too much attention to
4  that, but maybe had a description of me walking across
5  the street towards the woods. You know, perhaps had a
6  description of me after I returned and approached me.
7  I have no idea. My name was on my car in the
8  registration sticker of that year.
9      Q  Actually, he gave your description before
10  you were arrested, after the encounter in the woods.
11      A  After that encounter in the woods?
12      Q  Yes.
13      A  Well, perhaps he saw me walking across the
14  street towards them, but I don't know.
15      Q  But you just earlier testified who you saw
16  when you arrived, and you never described seeing
17  anyone of Sergeant Becker's description.
18      A  Sergeant Becker's description? I did
19  describe some people to -- in the parking lot. You
20  asked me if I had seen anyone else there.
21      Q  That's right.
22      A  And I'm, I'm just giving my best guess that
23  perhaps that's who the police officers may have been
24  in retrospect, that that's who they perhaps were.
25      Q  We didn't have any long-haired officers

Page 95

1  there that day.
2      A  Okay. Well, to my recollection --
3          MR. FLOCAS: I object to the
4  extent that that's testimony, and if it's a question,
5  you can answer.
6          THE WITNESS: Okay.
7      Q  (By Ms. Edwards) So we did not have any
8  officers there that fit the description of the only
9  people that you have described. So how would Sergeant
10  Becker have seen you if you say you never saw him,
11  much less assaulted him? Can you explain that?
12      A  I think, you know, I don't recognize Officer
13  Corpus, but I do remember a tunnel vision of Officer
14  Becker. I had made eye contact with him. He had a
15  gun trained on me twice, had shot me with it the
16  second time.
17      Q  Sir, that was Officer Rodriguez that had a
18  gun that day --
19      A  Oh, okay.
20      Q  -- not Sergeant Becker.
21      A  Okay. I'm confused then. The officer who
22  shot me, I remember his face. I don't recall. I'm
23  sorry. I'm confused. I'm trying to refer to the
24  officer who shot me. That's the only face that I'm
25  trying to say that I can clearly remember in detail,

Page 96

1  and I disagree with you about him having short hair
2  and being well groomed. He had a scraggly mustache.
3  I mean, I was at -- that's my memory of the incident.
4  That's my impression of my memory of the description.
5      Q  So you're saying he had -- he was scraggly,
6  he had a beard and a mustache. Earlier you said he
7  had a beard.
8      A  He had a big handlebar-type mustache --
9      Q  Okay.
10      A  -- from what I recall --
11      Q  All right.
12      A  -- on his face.
13      Q  That's who you recall seeing?
14      A  Yes. The one who had the gun.
15      Q  Okay. So if these officers -- obviously,
16  they were in plain clothes to do a sex sting. Have
17  you ever had any sex in that park?
18      A  No.
19      Q  No sexual encounters?
20      A  No.
21      Q  Do you know that that is a park where men do
22  have sexual encounters with other men?
23      A  I believe that was the purpose of putting
24  the sign up that you can see in any park, probably in
25  any state anywhere in this country.

24 (Pages 93 to 96)

Travis Casey

August 2, 2010

Page 97

1    Q    Well, actually, you don't know -- I do not
2  know that sign to be up in every park.
3    A    Well, I wouldn't -- I've seen it in other
4  parks too. Walnut Creek is not the only park that I
5  would go mountain-bike riding or hiking or picnicking
6  or spending time with my partner or the dogs or family
7  or friends for recreation to enjoy them.
8    Q    What other parks have you seen that sign in?
9    A    We've camped out at Mary Moore Searight,
10  we --
11    Q    Sir, my question was, what other parks have
12  you seen that sign in?
13    A    I believe I've seen it at Mary Moore
14  Searight Park, I believe I've seen it at Bull Creek
15  Park. Let's see. We would also go to a place off of
16  Duval, between Duval and Parmer, Amherst, Amherst
17  Park.
18    Q    And that has -- the same sign is there?
19    A    I think so. I'm not sure. I believe so
20  though.
21    Q    So why do you think -- can you explain why
22  Officer David Rodriguez would pull a gun on you if you
23  had done nothing wrong?
24    MR. FLOCAS: I'm going to object
25  to the extent that that calls for speculation. You

Page 98

1  can answer it.
2    THE WITNESS: Do you want me to
3  give -- okay. You asked the question.
4    Q    (By Ms. Edwards) Yes.
5    A    I'm going to tell you. Because I believe
6  that, I believe that my criminal attorney coined it
7  pretty well. He said they wanted to bag a fag and go
8  on a turkey hunt. He did it as -- what he said it
9  happened did not happen.
10    Q    I've never heard the term "go on a turkey
11  hunt." What does that mean?
12    A    It means I was there by myself, I
13  think -- I'm trying to reconcile in my own mind,
14  psychologically, in lots of ways to try to come up
15  with an answer to that myself, ma'am, and the best
16  thing that I can come up with so far is that I believe
17  basically that it was a hate crime. It was, it was a
18  misuse of a power that was given to an individual who
19  hurt a citizen that it was otherwise supposed to have
20  protected. It was --
21    Q    Well, these officers would have no way of
22  knowing your sexual orientation, would they?
23    A    They would --
24    MR. FLOCAS: Object to the extent
25  that calls for --

Page 99

1    THE WITNESS: They perhaps --
2    MR. FLOCAS: -- speculation. You
3  may go ahead.
4    THE WITNESS: -- assumed. I don't
5  know. I have no idea.
6    Q    (By Ms. Edwards) Why would they assume your
7  sexual orientation, sir?
8    A    I don't know. I --
9    MR. FLOCAS: [Inaudible.]
10    THE WITNESS: -- was trying to
11  make a -- I was trying to answer your question. You
12  asked me "why would you think." I have no idea why
13  anybody would think what they think. I'm not in their
14  mind.
15    Q    (By Ms. Edwards) Well, if, as you allege,
16  your criminal attorney stated that they just wanted to
17  bag a fag --
18    A    Yeah.
19    Q    -- well, they could do that just as well by
20  announcing they're police and showing their badges,
21  correct?
22    MR. FLOCAS: Objection to the
23  extent it calls for speculation.
24    THE WITNESS: I believe it was
25  attempted murder.

Page 100

1    Q    (By Ms. Edwards) Why is that?
2    A    Because I did not hurt anyone. I did not
3  speed at anyone in my car. If that was a police
4  officer, my tires could have been shot out, my car
5  could have been towed away. I -- when someone even
6  throws up their hands, you know -- I had no idea at
7  that time. I mean, if it was a police officer, why
8  did he shoot my car seven times and strike me through
9  the driver-side window?
10    My car was not even moving. It was
11  parked, it was in reverse. It was only after I got
12  shot that I reached across the steering column, put it
13  into drive, and tried to turn the steering wheel with
14  the broken power steering because one of the rounds
15  went through the hood of my car into the mechanisms,
16  and that's what happened.
17    Q    So both officers are lying?
18    A    Yes.
19    Q    Both officers are lying when they say you
20  tried to run them over?
21    A    Yes, they'd are.
22    Q    You did not try to run Officer Corpus over
23  when you put it in reverse?
24    A    No. I did not.
25    Q    So once he was no longer --

25 (Pages 97 to 100)

Travis Casey

August 2, 2010

Page 101

1    MR. HUNTSINGER:  Counsel, your
2  witness over there is shaking his head, frowning, and
3  making noises at my client, and I'm not okay with it.
4    MS. EDWARDS:  One lawyer in a
5  depo, and you're not it.
6    MR. FLOCAS:  I'd like to point out
7  your client is shaking his head and making some noises
8  that I think are on the tape, and if everybody could
9  just take a moment to instruct folks to remain quiet.
10    THE WITNESS:  May I take a break,
11  please?
12    MR. FLOCAS:  Sure.  Why
13  don't -- this is a good time for it.
14    VIDEOGRAPHER:  Going off the
15  record the time is 2:51.
16    (At 2:51 p.m. the proceedings
17  recessed, continuing at 3:11 p.m.)
18    VIDEOGRAPHER:  Going back on the
19  record the time is 3:11.
20    Q    (By Ms. Edwards)  Mr. Casey, when you first
21  saw the officers at a distance why were you afraid of
22  them?
23    A    Because of their appearance and going, "Hey,
24  hey you."  They were approaching me seeming that they
25  wanted something.  I was afraid I would get mugged or

Page 102

1  something.
2    Q    You're 6 foot 5, they're 5 foot 7.  Why
3  would you be afraid of these short guys?
4    A    There were two individuals there.  I,
5  I'm -- that's why.
6    Q    Well, are you afraid of everyone you
7  encounter in the park?
8    MR. FLOCAS:  I'm just going to
9  object to that as argumentative.  You can answer.
10    THE WITNESS:  People who approach,
11  greet me, and that I don't know, in an aggressive
12  manner, yes.  I am afraid of those kind of people in
13  the park when I'm there by myself.
14    Q    (By Ms. Edwards)  What was aggressive about
15  their manner?
16    A    Yelling at me, "Hey, hey you.  Stop."
17    Q    Is that it?
18    A    Yes.  Yes.
19    Q    What did you say to the officers before you
20  got in the car?
21    A    I said nothing to them.
22    Q    Did you lock the door when you got in the
23  car?
24    A    Yes.
25    Q    What did you say to the officers after you

Page 103

1  got into the car?
2    A    The only thing I said after I got into the
3  car was, "Please, God, don't shoot me."
4    Q    Didn't you say, "Fuck you, I'm not going to
5  jail"?
6    A    No.
7    Q    So if both officers say you said that,
8  they're lying?
9    A    That's correct.
10    Q    And if asked separately that question, they
11  both just happened to come up with the same lie?
12    A    Yes.
13    Q    How was Officer Corpus hitting the window?
14    A    It's -- I recall someone hitting the
15  driver-side window with their fist.  It was partially
16  cracked still, down several inches, and just seemed
17  like it was with a fist.
18    Q    What was he saying?
19    A    I don't know.
20    Q    He had his badge on, and you're saying you
21  did not see the badge?
22    A    I did not see the badge.
23    Q    Okay.  You don't deny that he had it on?
24    MR. FLOCAS:  Objection to the
25  extent --

Page 104

1    THE WITNESS:  I do deny that --
2    MR. FLOCAS:  -- that it's
3  testimony [inaudible].
4    THE WITNESS:  I don't -- I did not
5  see a badge, is all I can say.
6    Q    (By Ms. Edwards)  Mr. Casey, if you'd please
7  let your lawyer just finish his objection.
8    THE WITNESS:  Sorry.
9    MR. FLOCAS:  And actually, yeah,
10  we should avoid trying to talk over each other.
11    THE WITNESS:  I'm sorry.
12    Q    (By Ms. Edwards)  You deny that he was
13  wearing a badge?
14    A    Yes.  I deny.
15    Q    What about Officer Rodriguez who was in the
16  front of the car?  You deny he was wearing a badge?
17    A    I deny it.
18    Q    It's on a chain around his neck, and you
19  said he wasn't wearing it?
20    A    I did not see a badge --
21    Q    Oh, so you're --
22    A    -- on a chain around his neck.
23    Q    So you're not saying he wasn't wearing it,
24  you're saying you didn't see it?
25    A    I'm saying he wasn't wearing it.

26 (Pages 101 to 104)

Travis Casey                                                                August 2, 2010

Page 105

1    Q   After Officer Corpus, who's seated to my
2    right, banged on your driver's window, then what did
3    he do?
4    A   The Officer Rodriguez, who had the gun
5    trained on me, motioned to him with his right hand
6    towards the curb to back up.  He told Corpus to get
7    back on the curb.
8    Q   Did he do so?
9    A   Yes.
10   Q   And then you backed up?
11   A   As he was doing that, that's when I started
12   the ignition to my car.
13   Q   If you were so afraid, why didn't you start
14   the ignition to your car as soon as you got in it?
15   A   Because they were running to my car.  Just
16   as I got in the car they were just there.  My window
17   just got hit all of a sudden, and I look up and
18   someone is holding a gun on me.  I, I'm trying to cope
19   with this.
20   Q   Why didn't you start the ignition as soon as
21   you got in the car?
22       MR. FLOCAS:  Objection to the
23   extent it's been asked and answered.
24       THE WITNESS:  As soon as I got in
25   the car I just described to you what had happened.  I

Page 106

1    did not have even a moment to contemplate starting the
2    engine.  I thought I -- I hadn't thought of starting
3    the engine; just getting in my car to safety.  The
4    next thing I know, the sequence of events is my window
5    got hit and I look up and someone has a gun trained on
6    me.
7    Q   (By Ms. Edwards)  So it's your testimony the
8    car was not moving until you were fired upon; is that
9    correct?
10   A   That's correct.  The car was -- after the
11   second guy was moved over to the curb, he looked back
12   over at me with the gun, standing in front of it just
13   after I got in my car.  That's when I turned the
14   ignition on, had turned the wheel all the way to the
15   left.  I turned the wheel so that my car would back
16   out.  As soon as my car came to a complete stop then
17   he got in front of my car.  I threw up my hands and
18   said, "Please, God, don't shoot me," and he proceeded
19   to fire bullets into my car and came around to the
20   9:00 o'clock position and struck me.
21       So after that I reached across the
22   steering column with my left hand, I put it in drive.
23   And it was very difficult to do with my left hand, I'm
24   not a left-handed person.  I managed to get the
25   car -- I think the power steering was damaged, so it

Page 107

1    was difficult to steer the car towards the exit.
2    Q   You had your cell phone with you, correct?
3    A   I had a cell phone in the car.
4    Q   Um-hm.
5    A   Yes.
6    Q   You never called 911, did you?
7    A   No.  I didn't call 911.  I was more
8    concerned about trying to get to a safe place to do
9    so.
10   Q   Well, 911 is three digits.  You could have
11   called 911, correct?
12       MR. FLOCAS:  Objection to the
13   extent it's argumentative.  You can answer.
14       THE WITNESS:  And no, I couldn't
15   have called 911 at that time, in the danger, the
16   present danger that I was obviously in.  What could a
17   phone call do as opposed to trying to get out of the
18   immediate danger?
19   Q   (By Ms. Edwards)  Well, you never called
20   911, did you?
21   A   I was going to call 911, but I didn't have
22   to because I started hearing the sirens after I passed
23   the intersection of Parmer and Lamar.
24   Q   Well, you never called 911 while you were in
25   the park.  I mean, these officers are on foot.  They

Page 108

1    didn't chase you, did they?  They didn't chase the
2    car, did they?
3    A   I have no idea if they chased the car or
4    not.
5    Q   You weren't looking to see if they were
6    following you?  I mean, a man with a gun shooting at
7    you and you're not looking back or looking in your
8    rearview or side view to see if he's following you
9    with a gun?
10   A   The best I could hope for was to not feel
11   another thud hit me in the back of the head as I was
12   trying to get away --
13   Q   Okay.
14   A   -- for my life.
15   Q   So once you got away you're still in the
16   park.  Why didn't you recall 911?  You were shot.
17   A   Yes.  I was shot.  I was --
18   Q   Why didn't you --
19   A   -- shot.
20   Q   -- call 911 for help?
21   A   Because I was trying to get away from --
22   Q   Why didn't you --
23   A   -- the danger.
24   Q   -- call 911 so these two hippies could be
25   arrested?

27 (Pages 105 to 108)

Travis Casey                                                              August 2, 2010

Page 109

1          MR. FLOCAS:  Objection to the
2     extent it's been asked and answered.
3          THE WITNESS:  I've answered the
4     question, and I don't know.  That's my answer to you.
5     Q     (By Ms. Edwards)  No, sir.
6     A     No.  I --
7     Q     It's the first time I've asked you --
8     A     You --
9     Q     -- why you didn't call 911 so these two
10    hippies --
11    A     And I told you --
12    Q     -- could be arrested.
13    A     -- I was trying to get to safety first out
14    of the immediate danger so that I would not be hurt
15    further, to get to a safe place so I could do so.
16    That is my answer.  I can't elaborate any more on it
17    than that.
18    Q     Well, I'm familiar with the park, and
19    there's a great distance from --
20    A     I did not have my cell phone on me.  It was
21    probably under my seat.  I just -- it was a TracFone I
22    kept in my car in case of an emergency.
23    Q     This was an emergency, was it not?
24    A     Yes, it was, but with my arm blown up like
25    hamburger meat, my dog upset, the incident that just

Page 110

1     happened, it seemed more of a priority to get out of
2     that area than it was to sit there and make a 911 call
3     for -- I had no idea if I was going to be shot again
4     or killed.  I was fearful for my life.  I wanted to
5     get out of that area.
6     Q     Well, once you were out of the area, though,
7     you're out of the park, it's a very long distance from
8     the horseshoe where you were shot to the park exit.
9     They're not following you, there's no one with a gun.
10    Seems then why didn't you call 911 so these two
11    hippies who were just shooting the place up would get
12    arrested?
13    A     Because --
14          MR. FLOCAS:  Objection to the
15    extent it include facts not in evidence, is
16    speculation and also argumentative.  You may answer.
17          THE WITNESS:  Because I wanted to
18    get out of the area at that vicinity so I could pull
19    over and get some help and call 911.
20    Q     (By Ms. Edwards)  You didn't pull over.
21    Once the police found you there was a chase that went
22    quite a ways with the police car, wasn't there?
23    A     Not that I'm aware of.
24    Q     You -- you're not aware that you were in a
25    police chase?

Page 111

1     A     No, I'm not.
2     Q     You weren't?
3     A     There was no police chasing me.  I did not
4     see a cop car.  I was focused on my arm, trying to
5     reach into the floorboard to grab something to try to
6     put some compression on it.  My dog, the blood
7     everywhere, I was -- and I felt like I was going to
8     pass out.  I was trying to get somewhere out of that
9     immediate area there so I could -- I had gone down to
10    the end of Parmer, down Lamar over to a crossover.
11          And, yes, I did pull over, and
12    so -- yeah.  I was -- started hearing sirens, like I
13    said, after I crossed that intersection.  They started
14    getting louder.  That's why I pulled into the
15    construction zone, because I thought if I had passed
16    out, someone would find me.  I was trying to dig out
17    my cell phone to make the 911 call, but the sirens
18    started getting louder.  So I, I was shot.  I'd lost a
19    lot of blood.  I was fearful for my life.
20    Q     So you haven't listened to the audio or
21    watched the video of the police chase of you --
22    A     No.
23    Q     -- is that right?
24    A     I've never seen it.
25    Q     Okay.

Page 112

1     A     I'm not aware of it.
2     Q     What all did the -- tell me everything
3     the -- that Officer Corpus said to you during the
4     incident.
5     A     I don't recall Officer Corpus saying
6     anything to me except, "Hey, you," perhaps, "stop."
7     It could have been the other individual saying that.
8     I don't, I don't recall Officer Corpus saying anything
9     to me.
10    Q     Tell me everything that Officer Rodriguez
11    said to you during the incident.
12    A     I don't recall him saying anything to me.
13    Q     Tell me everything you said to the officers
14    during the incident.
15    A     "Oh, God, please don't shoot me."
16    Q     And that's all?
17    A     Yes.
18    Q     Did your car die at one point?
19    A     No.  But whenever I stopped in the
20    construction area on the frontage road of 35 the car
21    never ran again after that.  It was undriveable.  It
22    was totaled.
23          MS. EDWARDS:  I just need a few
24    minutes to go over my notes, I mean one minute to go
25    over my notes.

28 (Pages 109 to 112)

Travis Casey

August 2, 2010

Page 113

1        MR. FLOCAS:  Okay.  Sure.
2        MS. EDWARDS:  We don't need a
3   break.  I just need to go over my notes real quick.
4        MR. FLOCAS:  Um-hm.
5        Q     (By Ms. Edwards)  Just, so is it your
6   testimony you never tried to run over Officer Corpus
7   when you put the car in reverse?
8        A     Yes.  That is my testimony.
9        Q     So where was he when you're backing up?
10       A     Officer Rodriguez --
11       Q     Corpus.
12       A     Oh.  Corpus was on the curb --
13       Q     Um-hm.
14       A     -- standing on the grass.  He was not in the
15   parking lot at any time that my car was in motion.
16       Q     When did you first -- at what point did you
17   first start the ignition to your car?
18       A     The first time I started the ignition in my
19   car was after Officer Rodriguez motioned for Officer
20   Corpus to get back onto the grass up onto the curb.
21   That's when I started the ignition and put my car into
22   reverse.
23       Q     And then what?
24       A     I turned the wheel sharply to the left to
25   back out so that my car would be at an angle facing

Page 114

1   the exit.
2        Q     So you're saying you never moved your car or
3   even started it until after the first shot was fired?
4        A     No.  I moved my car after Officer Rodriguez
5   had motioned for Officer Corpus to get up onto the
6   curb.  As he was doing that and not making eye contact
7   with me, pointing his gun at me, that's when I started
8   the car.  I back out, like I described, my foot on the
9   brake.  The car was in reverse.  Officer Rodriguez got
10   in front of my car in the 12:00 o'clock position, and
11   that's when I threw up my hands and said, "Please,
12   God, don't shoot me."  And he began shooting at my car
13   into the hood, reaching around and finally making his
14   way to the 9:00 o'clock position and shot me through
15   the driver-side window of my car.
16       Q     When did you hit the gas and go forward?
17       A     Well, the power steering seems to have been
18   out in the car.  It hit, like, mechanisms on the
19   internal part of the car.  I reached over the steering
20   column with my left hand, put it into drive, and then
21   was trying with my left hand to steer the car towards
22   the exit.  It was like the car didn't even really want
23   to move.  It had damage to it.
24       Q     So are you saying you did not drive forward
25   until after you were hit?

Page 115

1        A     That's correct.  Until after I had been shot
2   the car did not go forward.
3        Q     You realize you were parked right at the
4   restrooms; isn't that right?
5        A     No.  I was not parked right at the
6   restrooms.
7        Q     The --
8        A     I was parked more towards the edge of the
9   exit in the horseshoe.
10       Q     The restrooms are right there at the
11   horseshoe, correct?
12       A     There are restrooms at the top point of that
13   point, but at no time did I go to the restroom while I
14   was there.
15       Q     What is your current residence?
16       A     My current residence is 517 West Hopkins,
17   San Marcos, Texas 78666.
18       Q     How do you support yourself unemployed?
19       A     Currently I'm still in the work trial
20   period, so I'm receiving benefits.  I'm currently
21   seeking full-time employment with some good options.
22       Q     So your only means of support is your $827 a
23   month?
24       A     At this time, yes.
25       Q     What is your fee arrangement with your

Page 116

1   attorneys?
2        A     My fee arrangement with my attorneys?
3        Q     Yes.
4        THE WITNESS:  Would you answer
5   that?  Can you answer that?  Are you allowed to?
6        Q     (By Ms. Edwards)  No.  The question is for
7   you, sir.
8        MR. FLOCAS:  If -- to the extent
9   you're able to.
10       THE WITNESS:  Oh, my fee
11   arrangement.  Okay.
12       MR. FLOCAS:  Whatever you can --
13       THE WITNESS:  I believe my fee
14   arrangement is, at a successful conclusion of the
15   suit, 25 percent, and then there's -- there are
16   variations if it goes to a certain, certain levels of
17   representation.
18       Q     (By Ms. Edwards)  How much have you paid
19   your attorneys to date?
20       A     I have not paid my attorneys present
21   anything.  The criminal attorney I had paid $5,000,
22   Christopher Holub I had paid 20 -- $2,200.
23       Q     Where did you get $7,200 to pay these
24   attorneys?
25       A     7-dollar-an-hour job.

29 (Pages 113 to 116)

Travis Casey

August 2, 2010

---

Page 117

1          MS. EDWARDS:  Pass the witness.
2          MR. FLOCAS:  We'll reserve.
3          VIDEOGRAPHER:  This concludes
4  today's deposition.  We are going off the record, the
5  time is 3:30.
6          (At 3:30 p.m. the proceedings
7  adjourned.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 118

1          CHANGES AND SIGNATURE
2              TRAVIS CASEY
3              AUGUST 2, 2010
4  PAGE  LINE  CHANGE                    REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

---

Page 119

1          I,    TRAVIS CASEY    , have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted on the
4  preceding page.
5
                    _____
                          TRAVIS CASEY
6
7  STATE OF TEXAS        )
                         )
8  COUNTY OF _____ )
9      Before me _____ (name of
10 officer) on this day personally appeared   TRAVIS CASEY ,
11 known to me (or proved to me under oath or through
12 _____ (description of identity card or other
13 document)) to be the person whose name is subscribed to
14 the foregoing instrument and acknowledged to me that they
15 executed the same for the purposes and consideration
16 therein expressed.
17     Given under my hand and seal of office on this _____
18 day of_____, A.D., 2010.
19
20                   _____
                     Notary Public in and for
21                   The State of Texas
22 My Commission Expires:
23 _____
24
25 ___ No Changes Made   ___ Amendment Sheet(s) Attached

---

Page 120

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION
3
   TRAVIS CASEY,                 °
4
       Plaintiff,               °
5                               °
   v.                           °   CASE NUMBER
6                               °   A-09-CA-337 SS
   OFFICER DAVID RODRIGUEZ °
7  and THE CITY OF AUSTIN,      °
8      Defendants.              °
9      REPORTER'S CERTIFICATION OF THE
10     ORAL DEPOSITION OF TRAVIS CASEY
11           AUGUST 2, 2010
12     I, Sandra S. Givens, Certified Shorthand Reporter
13 in and for the State of Texas, hereby certify to the
14 following:
15     That the witness,    TRAVIS CASEY    , was
16 duly sworn by the officer and that the transcript of
17 the oral deposition is a true record of the testimony
18 given by the witness;
19     That the original deposition transcript was
20 submitted to: Travis Casey in care of his attorneys at
21 Huntsinger Law Office, PLLC.
22     That a copy of this certificate was served on all
23 parties and/or the witness shown herein on August 6,
24 2010.
25     I further certify that pursuant to FRCP Rule

---

30 (Pages 117 to 120)